**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jesus BENITEZ–ARREGUIN,**
**Defendant–Appellant.**

**No. 91–4040.**

United States Court of Appeals,
Tenth Circuit.

July 1, 1992.

Order on Rehearing Sept. 3, 1992.

**824**

G. Fred Metos, Salt Lake City, Utah, for defendant-appellant.

Mark K. Vincent, Asst. U.S. Atty., Salt Lake City, Utah (David J. Jordan, U.S. Atty., with him on the brief), for plaintiff-appellee.

Before LOGAN and HOLLOWAY, Circuit Judges, and CONWAY, District Judge.[*]

HOLLOWAY, Circuit Judge.

This is an appeal from a conviction under 21 U.S.C. § 841(a)(1) for possession of heroin with intent to distribute. The defendant was convicted on a jury verdict of guilty as to Count I of the indictment. He was sentenced for a term of 63 months of imprisonment, to be followed by five years of supervised release, and a $50 special assessment. Defendant appeals, claiming error in the denial of a motion to suppress evidence including the controlled substance.

I

A

The issue raised concerns a search at the Salt Lake City, Utah, Amtrak Station. At that time defendant Benitez–Arreguin arrived from Los Angeles by train and was noticed by Utah state narcotics agents Hall and Larsen, who were on duty at the station on May 30, 1990. They testified that they were to "profile" passengers arriving on the early morning train from Los Angeles. II R. 3–4. The defendant was the only Hispanic observed leaving the train. *Id.* at 49. He entered the station and was followed by the officers who observed him

---

[*] The Honorable John E. Conway, United States District Judge for the District of New Mexico, sitting by designation.

carrying two cloth symmetrical bags about two feet in length and eight inches in diameter. *Id.* at 37. Defendant did not retrieve any other luggage from the baggage counter.

In the station, defendant went to a telephone to place a call. Agent Larsen stood nearby and attempted to overhear the conversation. However, defendant conversed in Spanish, which Larsen did not understand. III R. 51. After making the call, defendant took a seat in the waiting area of the station, placing the two bags near his feet and under his chair. As he sat in the waiting room, he looked around and watched other people. Hall and Larsen moved about the waiting room, watching the defendant.

About ten or fifteen minutes later another male Hispanic, Ramirez, entered the station. Defendant picked up his bags and the two walked out of the station together. The agents followed and Hall asked to speak with them and displayed his badge. II R. 41. The agents then requested identification from defendant and Ramirez. The defendant produced a "green card." When Larsen attempted to talk to defendant, he realized that defendant did not speak English. In his report, Hall said that defendant Benitez–Arreguin did not speak English. *Id.* at 28. Larsen spoke and made hand motions toward the bags held by the defendant to indicate that he wanted to look into the bags. *Id.* at 46. Larsen testified at the suppression hearing that the defendant opened the first bag, which contained clothing. Larsen then used gestures indicating he wanted to look into the other bag. The defendant bent down, opened it and handed it to Larsen. *Id.* at 47. In the second bag, Larsen found some pants, and in a pocket he found a tube-shaped object six or eight inches long and wrapped in duct tape. After this incident, Larsen testified that he took the suspected narcotic and placed it back inside the bag and had his narcotics dog inspect it, and the dog made a definite alert. *Id.* at 48–49. Larsen opened the package and had the contents tested later by the state crime lab and it was found to contain heroin, about 350 grams in quantity. *Id.* at 49.

At the suppression hearing, the defendant testified that he did not speak English. His testimony throughout was conducted through an interpreter. He had been in this country approximately two or three years during the fruit season but spent most of his time in Mexico. III R. 2–3. On May 30, 1990, he was at the train station in Salt Lake City, and when Mr. Ramirez came into the station the defendant stood and greeted him, shaking hands, and they started to go outside. He said that at this point two policemen overtook them, got in front of them and showed Ramirez and the defendant their badges. *Id.* at 5. Ramirez and the defendant stopped and the officers then asked for their identification. He understood this because the word "identification" was very similar to the word in Spanish. *Id.* at 6. The defendant then showed the officer his green card issued by the Immigration Service. It was returned to them when they went to an officer in the train station. *Id.*

The defendant said the officers then made signs which the defendant took to mean that they wanted to search the suitcases. The defendant did nothing to stop them from searching the suitcases because they were policemen. III R. 7. When the suitcases were searched, the officer still had defendant's identification. The defendant said he did not understand he had the right to deny the officer permission to look in the bag. *Id.* The defendant testified that he knew Ramirez because he had come to Salt Lake City once looking for work, sometime around April. When one of the officers made signs pointing toward the bag, he was looking at the defendant's face and the officer bent down and opened the bag. As he was bending down, the officer said "coca, mota, chiva." *Id.* at 15. "Mota," he had heard, was marijuana, and "chiva," the defendant believed, was heroin. The defendant's response to the officer's statements was only to shrug his shoulders and hold his hands up as if to signify he did not know anything. *Id.* at 16.

The defendant testified that just one of the two bags was his, the large one carrying his clothing and lotions. The other one he got when he was looking for work. A friend in a Los Angeles bar, who was not

really a friend, knew that the defendant was looking for work and asked the defendant if he could take the bag for him to a hotel, "Colacha," in Salt Lake City. III R. 19. The man told the defendant that someone would get the bag at the hotel, a woman who would take him to a farm to work. The defendant was told that the bag belonged to the woman and contained children's clothing. *Id.* at 21, 23. The defendant did not know if the bag belonged to the friend or to the woman, but he was to take it to her and the defendant did not look inside the bag. The defendant took care of the bag as if it were his, but he did not know what was inside the bag. *Id.* at 24–25. The defendant testified that he did not want the officers to search the bags because he was in charge of them. *Id.* at 25.

### B

After hearing the testimony in two hearings on the suppression motion, the trial judge heard oral argument and made his ruling from the bench. The judge found that from the totality of the circumstances there was a valid *Terry*-type stop. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The judge said that some of the observations, such as the man sitting in the chair, the reading of a book or watching television, did not impress him as showing a basis for suspicion. However, the judge said he was impressed that the police officer had a vast background of experience and testified that the defendant appeared to be nervous, looking over both shoulders, and seemingly anxious to be going someplace. He looked like a man with a mission. He seemed to know where a telephone was, although it was not obvious. The greeting for Ramirez was unusual in that the defendant did not embrace Ramirez or seem to even shake his hand. IV R. 34–35.

The judge found that the examination of the bag was not consensual. There was no clear and unequivocal or specific permission given. The judge found there was implied duress and that the presumption against waiver of constitutional rights was not overcome. Also, there was an obvious language barrier and it was obvious to the

officer that the defendant did not speak English. The pantomime gestures were not sufficient to produce a consent to search.

The judge then turned to the issue of the extent of the defendant's rights under the Fourth Amendment, or standing. Citing *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), he found that arcane distinctions developed in property and tort law concerning guests, licensees, invitees and the like ought not to control. Thus whether the defendant was a bailee or not, the judge found the real question to be whether the defendant had a subjective expectation of privacy, and whether society would recognize the expectation as objectively reasonable. The judge took the position that even though the search would not have been permitted due to lack of a valid consent, the fortuitous circumstance that the defendant disclaimed ownership in the bag was such as to destroy his right to standing to raise the question, even though that was not known by the officer. IV R. 36–37. Accordingly, the motion to suppress was denied from the bench.

The ruling was memorialized in a written order of October 4, 1990. There the court stated: that the initial stop of the defendant was not a consensual police-citizen encounter; that, however, it did constitute a valid investigatory stop under *Terry v. Ohio* in light of the totality of the circumstances creating a reasonable suspicion; that the search of the defendant's bag containing the controlled substance was not consensual because of implied duress and the obvious language barrier and because the pantomime gestures were an insufficient method by which to obtain clear and unequivocal consent. The order concluded:

4. The defendant's subsequent disclaimer of ownership of the bag and his testimony regarding the circumstances by which he came into possession of the bag and where he was taking the bag, effectively destroys his standing to bring this motion to suppress.

The court finds that the defendant possibly had a subjective expectation of privacy in the bag, however the court finds

that society would not recognize such an expectation as objectively reasonable under the circumstances of this case. The police officer's lack of knowledge about a possible standing issue at the time the bag was searched and seized is immaterial.

I R. Doc. 21, at 2.

After the subsequent trial and his conviction on the jury's verdict, the defendant appealed.

## II

■ In order to challenge the validity of a search and seizure, a defendant bears the burden of demonstrating that his or her own Fourth Amendment rights have been violated. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 133–34, 99 S.Ct. 421, 424 n. 1, 425–26, 58 L.Ed.2d 387 (1978); *United States v. Abreu,* 935 F.2d 1130, 1132 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991). The issue whether a search violated a defendant's Fourth Amendment rights involves two inquiries. First, a defendant must establish that he or she had a subjective expectation of privacy in the place or property searched. *E.g., Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Abreu,* 935 F.2d at 1132. Second, a defendant must establish that society would recognize his or her subjective expectation as objectively reasonable. *E.g., Smith,* 442 U.S. at 740, 99 S.Ct. at 2580; *Abreu,* 935 F.2d at 1132. We review a district court's factual findings made on a motion to suppress under the clearly erroneous standard. *E.g., United States v. Jefferson,* 925 F.2d 1242, 1248 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 238, 116 L.Ed.2d 194 (1991). However, we review *de novo* a district court's

ultimate objective determination whether society would recognize a defendant's subjective expectation of privacy. *Id.* at 1248–49.

■ Defendant Benitez–Arreguin seeks to establish a protected Fourth Amendment interest in part based upon his status as a bailee. However, one of the fundamentals of Fourth Amendment privacy interest analysis is that "arcane distinctions developed in property and tort law between guests, licensees, and the like, ought not to control." *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430 (1978); *see also United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980) ("While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry."). Thus, a Fourth Amendment violation does not automatically result from the illegal seizure of property from a person who is the owner, *see Rawlings v. Kentucky,* 448 U.S. 98, 105–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980), or who has legal possession, *see Salvucci,* 448 U.S. at 91–93, 100 S.Ct. at 2552–54.

■ We agree that in such circumstances a bailee carrying luggage for another person could have a legitimate expectation of privacy in the luggage.[1] In analyzing the case of a bailee, we consider the factors that generally might give any defendant a legitimate expectation of privacy, including ownership, lawful possession, or lawful control of the property or place searched. *See United States v. Arango,* 912 F.2d 441, 445 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991). A bailee may make a

---

1. Benitez–Arreguin notes Professor LaFave's analysis that "[a] person who is not the owner of the container but who possesses it by virtue of his status as bailee certainly has standing to object to illegal interference with his possessory interest." 4 Wayne R. LaFave, *Search and Seizure* § 11.3(f), at 344 (2d ed. 1987). Some courts have recognized that a bailee may have a protected Fourth Amendment privacy interest in bailed property. *Robles v. State,* 510 N.E.2d 660, 663 (Ind.1987), *cert. denied,* 487 U.S. 1218,

108 S.Ct. 2872, 101 L.Ed.2d 907 (1988); *State v. Grundy,* 25 Wash.App. 411, 607 P.2d 1235, 1237–38 (1980); *see also State v. Casey,* 59 N.C.App. 99, 296 S.E.2d 473, 482 (1982) (holding defendant given possession and control of bags had legitimate expectation of privacy in luggage he claimed belonged to another). *See generally United States v. Oswald,* 783 F.2d 663, 666 (6th Cir.1986) (explaining "[a] suitcase or briefcase is property of a kind in which the owner or bailee normally has a strong expectation of privacy").

substantial claim of legitimate expectation of privacy because, as we have observed, "[a]lthough neither ownership nor lawful possession are determinative, they are often dispositive factors." *Id.* at 445; *see also Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 (one owning or lawfully possessing or controlling property will in all likelihood have legitimate expectation of privacy by virtue of right to exclude).

▮ A proponent of a motion to suppress who relies upon the lawful possession factor bears the burden of presenting at least some evidence that his or her possession was lawful. While "the proponent of a motion to suppress need not always come forward with legal documentation establishing that he lawfully possessed the area searched, the proponent must at least state that he gained possession from the owner or someone with the authority to grant permission." *Arango,* 912 F.2d at 445 (citation omitted). At the suppression hearing, Benitez–Arreguin explained that a man asked him to deliver the bag to a woman in Salt Lake City. The government did not present evidence that contradicted the defendant's story. The district judge did not reject the defendant's claim about how he came into possession of the bag. We feel that Benitez–Arreguin satisfied his initial burden by asserting a possessory interest in the bag through a bailment. *See Robles v. State,* 510 N.E.2d 660, 663 (Ind.1987), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988) (decided under federal Fourth Amendment); *State v. Grundy,* 25 Wash.App. 411, 607 P.2d 1235, 1237–38 (1980) (same).

We are persuaded further that defendant's subjective expectation of privacy is one which society would recognize as objectively reasonable. In general, luggage such as suitcases and footlockers is "a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Arkansas v. Sanders,* 442 U.S. 753, 762 & n. 9, 99 S.Ct. 2586, 2592 & n. 9, 61 L.Ed.2d 235 (1979). In other contexts, we have held that lawful possession carries with it the legitimate expectation of privacy. *See, e.g., United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990) (holding in automobile search case that "[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle"). We agree with the courts that have concluded that a person transporting luggage as a bailee, or at least with the permission of the owner, has a reasonable expectation of privacy that society would recognize. *See Robles,* 510 N.E.2d at 663; *Casey,* 296 S.E.2d at 482; *Grundy,* 607 P.2d at 1237–38. Further, we feel that society's recognition of defendant's expectation of privacy is indicated by "the general rule that a bailee in possession of personal property may recover compensation for any conversion of the article bailed or destruction of or damage to the bailed property, by another while in his possession." 8 Am.Jur.2d *Bailments* § 263, at 994 (1980).

▮ The cases relied on by the government and its argument that there was a disclaimer here such as to destroy the defendant's position on standing are unpersuasive. The argument and authorities deal mainly with situations where a defendant wholly eschews any interest in or knowledge of the searched property.[2] We

---

**2.** *See United States v. Garcia,* 849 F.2d 917, 918–19 (5th Cir.1988) (upholding trial court's ruling that defendant abandoned suitcase by denying ownership); *United States v. Hawkins,* 681 F.2d 1343, 1344, 1346 (11th Cir.) (upholding denial of motion to suppress because of defendant's "unsolicited and violent" denials of an interest in suitcase prior to search), *cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982); *United States v. Canady,* 615 F.2d 694, 695–97 (5th Cir.) (upholding finding that defendant abandoned suitcase he repeatedly denied owning prior to and after search), *cert. denied,* 449 U.S. 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir. 1978) (holding search of luggage consensual in part because "appellant denied both ownership and any knowledge of the owner of the bag" prior to search), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). *But see United States v. McBean,* 861 F.2d 1570, 1572 & n. 3, 1574 (11th Cir.1988) (per curiam) (holding defendant by disclaiming ownership and knowl-

feel this is a distinguishable case because here the defendant on the contrary testified that he had not wanted the bags searched because he was in charge of them. III R. 25. The defendant's testimony that he had been given possession of the second bag and asked to deliver it in Salt Lake City did not amount to a denial of any connection to the bag; his position was thus not an effective disclaimer of any subjective expectation of privacy in the bag, either at the time of the search or at the hearing.

We are convinced the defendant had a sufficient interest as a bailee to challenge the search. Indeed, in *Rakas*, the Court noted that "[o]ne of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns *or lawfully possesses or controls property* will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12 (emphasis added).

 In sum, we agree with the trial judge's conclusion that the initial stop was valid under *Terry v. Ohio* due to the totality of the circumstances creating reasonable suspicion. We are satisfied that the defendant had a sufficient right to claim the Fourth Amendment's protection with respect to the bag in his charge as bailee. We are also convinced that the record amply supports the finding that the subsequent search of the defendant's bag containing the controlled substance was not consensual. Thus, there being no warrant, and no claim by the government of probable cause and exigent circumstances to search without a warrant, the defendant's Fourth Amendment rights were infringed. *See, e.g., United States v. Smith*, 797 F.2d 836, 840 (10th Cir.1986).

Accordingly, we hold that the denial of the motion to suppress was in error. The conviction of the defendant must be REVERSED and the cause is REMANDED for further proceedings in accord with this opinion.

CONWAY, District Judge, concurring in part and dissenting in part.

I agree with the Court's analysis regarding the validity of the initial stop and nonconsensual nature of the search of the bag carried by the defendant. However, I would affirm the lower court's denial of the motion to suppress for lack of standing given the circumstances of this case. Specifically, I am troubled by the notion that society would deem objectively reasonable a bailee's subjective expectation of privacy in a bag containing contraband which he claims to have received from a virtual stranger and with no personal knowledge of its contents.

We have said that "[t]o decide whether a reasonable expectation of privacy exists, we consider concepts of real or personal property law, bearing in mind that 'arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control.'" *U.S. v. Arango*, 912 F.2d 441, 445 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). In my view the majority relies exclusively on the "bailment" law peculiarities to stretch the reasonableness of privacy expectations of a bailee to "unknown" limits.

I agree that luggage is "a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979) (emphasis added). In the absence of knowledgeable connection with the contents of the container, however, any proposed association with privacy seems remote and abstract. When one has placed none of his own "personal effects" within the luggage and its contents include unlawfully possessed controlled substances, an expectation of privacy appears neither inevitable nor warranted.

The majority states that "a Fourth Amendment violation does not automatical-

---

edge of contents of luggage given to him to take

to another city precluded challenge of search).

ly result from the illegal seizure of property from a person ... who has legal possession." Majority Op. at 827. Yet, it is precisely a bailee's right to exclude others which apparently triggers a reasonable expectation of privacy in the majority's view. In essence the majority holds that "lawful possession carries with it the legitimate expectation of privacy." Majority Opinion at 828. Such an "automatic" result renders as surplusage the Supreme Court's hedging statement that "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *See Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387 (1978) (emphasis added).

The Supreme Court advises that "in determining whether an individual's Fourth Amendment rights have been violated, [cite omitted], property rights are neither the beginning nor the end of this Court's inquiry." *See U.S. v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980). I believe that for the majority, property rights were both the beginning and end of its analysis. In the rush to align ourselves with results reached by other courts, we should not blind ourselves to the heart of the privacy interests our Constitution preserves. The application of the exclusionary rule to this case trivializes genuine privacy expectations worthy of society's protection against unjustifiable governmental intrusion. This case presents a situation where neither ownership nor lawful possession should be determinative or dispositive of a reasonable expectation of privacy.

I would affirm the trial court and uphold the conviction.

## ORDER ON REHEARING

On consideration of the petition for rehearing en banc and the response, the court concludes as follows:

The dispositive question of this appeal is whether the defendant-appellant had an expectation of privacy in the luggage he was carrying which society would recognize as objectively reasonable. The evidence at the suppression hearing and the trial judge's findings are thoroughly detailed in our opinion. The judge did not reject the credibility of the defendant's testimony on the circumstances underlying the seizure of the contraband from the luggage in defendant's care. In fact, his findings conceded that "the defendant possibly had a subjective expectation of privacy in the bag." I R. Doc. 21, at 2. Instead the rejection of defendant's Fourth Amendment claim was based on one point: "the court finds that society would not recognize such an expectation as objectively reasonable under the circumstances of this case." *Id.* at 2. We were unable to agree with this legal conclusion and accordingly reversed.[1]

As our opinion pointed out, the trial judge found that there was a valid *Terry* stop, which we accepted. He found, however, that the search of the second bag was not consensual; there was no clear and unequivocal consent given and there was an obvious language barrier that was acknowledged several times by officer Larsen.

The petition relies heavily on *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), arguing that our decision is contrary to the rationale of those opinions. We are not persuaded. In fact, we carefully noted, maj. op. at 827, the reasoning of *Rakas* that "arcane distinctions developed in property and tort law between guests, licensees, and the like, ought not to control." 439 U.S. at 143, 99 S.Ct. at 430. And we likewise were respectful of the Court's teaching in *Salvucci* that "[w]hile property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, ... property rights are neither the beginning nor the end of this Court's inquiry." 448 U.S. at 91, 100 S.Ct. at 2553.

---

1. Our opinion noted that this controlling ultimate objective determination is one we must review *de novo*. *United States v. Jefferson*, 925 F.2d 1242, 1248–49 (10th Cir.1991).

We accordingly considered all the underlying circumstances which were not in dispute. The defendant's testimony, not rejected by the trial judge, was that an acquaintance asked him to deliver the bag to a woman in Salt Lake City. The defendant was told that the bag belonged to the woman and that it contained children's clothing. III R. 21, 23. Arriving at the Salt Lake City train station, he sat down and placed the bag right beneath him after a phone call. II R. 38. The defendant testified that he took care of the bag as if it were his. III R. at 24–25. The defendant said he did not want the officers to search the bags because he was in charge of them. *Id.* at 25. And the trial judge found that the defendant did not give valid consent for the bag to be searched.

We remain convinced that the factual situation here shows an expectation of privacy that society would recognize as reasonable. This conclusion comfortably fits within the Supreme Court's reasoning in *Rakas* that distinctions in property and tort law between guests, licensees, and the like, ought not control. We have instead considered all the circumstances, as noted above and in our opinion, and we are satisfied that the defendant at the time of the seizure did have a legitimate expectation of privacy as one in charge of the bag, and that it was one which society would recognize as objectively reasonable. The bag was "a common repository for one's personal effects and therefore [was] inevitably associated with the expectation of privacy." *Arkansas v. Sanders*, 442 U.S. 753, 762 & n. 9, 99 S.Ct. 2586, 2592 & n. 9, 61 L.Ed.2d 235 (1979). Federal and state cases decided under the Fourth Amendment have held that such an expectation of privacy is one that society would recognize. *See United States v. Reeves*, 798 F.Supp. 1459 (E.D.Wash.1992) (holding bailee had expectation of privacy in briefcase which was objectively reasonable); *Robles v. State*,

510 N.E.2d 660, 663 (Ind.1987) (holding bailee had standing to challenge search of luggage), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988); *State v. Casey*, 59 N.C.App. 99, 296 S.E.2d 473, 482 (1982) (holding bailee had standing to challenge search of luggage); *State v. Grundy*, 25 Wash.App. 411, 607 P.2d 1235, 1237–38 (1980) (holding bailees had standing to challenge search of stolen footlocker). *See generally United States v. Oswald*, 783 F.2d 663, 666 (6th Cir.1986) (explaining that "[a] suitcase or briefcase is property of a kind in which the owner or bailee normally has a strong expectation of privacy ... but ... such an expectation can be given up").[2]

■ The reasonableness of such an expectation of privacy is supported by the bailee's right of exclusion. "One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns *or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." Rakas*, 439 U.S. at 144 n. 12, 99 S.Ct. at 431 n. 12 (emphasis added). A bailment may give "the bailee the sole custody and control of the article bailed, or the right to exclusive possession of the property, even against the bailor." 8 C.J.S. *Bailments* § 29, at 254–55 (1988) (footnotes omitted). This general rule is followed in both states, California and Utah, which had a relationship to the bailment here. *See McPherson v. Belnap*, 830 P.2d 302, 304 (Utah Ct.App. 1992); *Porter v. Los Angeles Turf Club, Inc.*, 40 Cal.App.2d Supp. 840, 105 P.2d 956 (1940). The defendant's acts here respecting the bag were consistent with the bailee usually having a legal duty to care for the property. 8 C.J.S. *Bailments* § 46, at 276–77; *see, e.g., Staheli v. Farmers' Coop. of S. Utah*, 655 P.2d 680, 682 (Utah 1982); *Barlow Upholstery & Furniture Co. v. Emmel*, 533 P.2d 900, 901 (Utah 1975); *Baugh v. Rogers*, 24 Cal.2d 200, 148 P.2d

**2.** Of course, "a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered." *United States v. Jacobsen*, 466 U.S. 109, 114 & n. 9, 104 S.Ct. 1652, 1657 & n. 9, 80 L.Ed.2d 85 (1984) (citing cases).

633, 641 (1944).[3]

We are not persuaded by the government's argument premised on *United States v. McBean*, 861 F.2d 1570 (11th Cir. 1988). There the court's rejection of a privacy claim was based on the fact that the defendant affirmatively disavowed any privacy expectation in the luggage. *Id.* at 1573–74. Here, on the contrary, the circumstances we have outlined show the protective action that the defendant took respecting the bag and the court found as a fact that there was not valid consent for search of the bag. And importantly, only the first question of whether the individual manifested a subjective expectation of privacy was involved, *id.* at 1573, and not the dispositive issue here as to whether society would accept as reasonable the defendant's expectation of privacy.

For these reasons, the petition for rehearing is DENIED. Judge Conway voted to grant rehearing by the panel.

In accordance with Rule 35(b) Fed.R.App. P., the suggestion for rehearing en banc was transmitted to all of the Judges of the Court who are in regular active service and to the members of the hearing panel. A poll was requested on the suggestion for rehearing en banc. There not being a majority of the Judges of the Court in regular active service voting for rehearing en banc, the suggestion for rehearing en banc is DENIED. Judge Baldock and Judge Kelly voted to grant rehearing en banc.

---

**3.** On this point, the government relies upon the holding in *United States v. Monie*, 907 F.2d 793 (8th Cir.1990), that a man hired to drive a car across country did not have a legitimate expectation of privacy in two suitcases in the trunk. We find *Monie* clearly distinguishable. The defendant there denied ownership of the locked suitcases of another in a car trunk, disclaimed any interest in their contents, and told the troopers he did not have keys to them. On these facts, the court held that the first factual test of a subjective expectation of privacy was not met. The court did *not* reach the second issue, which is the only and controlling question here—whether the privacy expectation was one that society would recognize as reasonable. *See id.* at 794.