**Dexter HYPOLITE, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 04–97–00758–CR.

Court of Appeals of Texas, San Antonio.

Dec. 16, 1998.

Anthony Nicholas, Sharon S. Brown, Nicholas & Barrera, P.C., San Antonio, for Appellant.

Edward F. Shaughnessy, III, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice and CATHERINE STONE, Justice.

## OPINION

PHIL HARDBERGER, Chief Justice.

Appellant, Dexter Hypolite ("Hypolite"), appeals his conviction for possession of marijuana. Hypolite presents four issues, contending: (1) the trial court erred in denying his motion to suppress under both the United States and Texas Constitutions; (2) the trial court erred in admitting his post-detention/arrest statement; and (3) the evidence was factually insufficient to support the jury's verdict on the element of knowledge. We overrule these issues and affirm the trial court's judgment.

### FACTUAL HISTORY

An airline ticket agent, Carmelo Monge ("Monge"), became suspicious of Hypolite because he appeared very nervous while checking his suitcase at the ticket counter. After consulting with his boss, Monge did not place Hypolite's suitcase on the baggage conveyor, but retained the suitcase behind the counter. During a break in the passenger check-in process, Monge took the suitcase to the security x-ray area. The security officers informed Monge that the suitcase could not be cleared because a dark area near the handle of the suitcase could not be penetrated or identified.

Monge proceeded to the gate area and informed Hypolite that a problem existed with regard to his suitcase. Monge requested that Hypolite accompany him, and Hypolite complied. At the security checkpoint, Monge asked Hypolite to open the suitcase. Hypolite initially stated that he did not have the key to the suitcase, because the key was in the possession of his traveling companion, Roger Thomas ("Thomas"). In response to further questions, Hypolite explained that the suitcase belonged to Thomas. Monge asked Hypolite to return with him to the ticket area to wait for Thomas because they needed to look inside the suitcase. Hypolite complied. Monge stated that he would not have prevented Hypolite from leaving the airport, just from boarding the plane.

After returning to the ticket counter, Monge phoned the airport police and requested that they notify drug enforcement personnel. A short time later, Thomas walked into the airport, passing Hypolite and proceeding to the ticket counter. After checking Thomas's suitcase, Monge stated that Hypolite had informed him that Thomas had the key to the suitcase Hypolite checked. Monge was uncertain whether Thomas stated that he did not have the key or it was not his suitcase. Monge stated that airport security and a drug enforcement agent were present in the area when Thomas entered the airport.

Javier Cortinas, a sergeant investigator with the Department of Public Safety, received Monge's page but testified that he also had observed Hypolite when he initially checked his suitcase, independent of the information Monge provided. Cortinas testified that Hypolite appeared nervous and uneasy. Cortinas was distracted from his initial observation by a personal page, but when he returned, he noticed Hypolite standing with his suitcase by some chairs in front of the ticket counter. Hypolite appeared impatient at this time.

Cortinas then observed a second man enter the airport, later identified as Thomas. Cortinas stated that Thomas continually looked at Hypolite, and by their gestures and eye contact, Cortinas had no doubt that the men knew each other. Cortinas then received the page from Monge, requesting that he approach the ticket counter.

Cortinas approached the counter and spoke with Monge at the side of the counter.

Monge informed Cortinas of his observations. Monge also informed Cortinas that based on the manner in which the tickets were issued to Hypolite and Thomas, he had little doubt that the men were traveling together. Cortinas then approached Thomas, identified himself as a police officer, and requested identification. Thomas presented his identification, and Cortinas asked if he knew Hypolite. Thomas denied knowing him. Cortinas then asked whether Thomas would accompany him to where Hypolite was standing, and Thomas consented.

When Thomas and Cortinas approached Hypolite, Cortinas's partner, Bill Stanley, had already requested Hypolite's identification. Stanley handed Hypolite's identification and tickets to Cortinas, and Cortinas asked Hypolite about his travel plans and the reason he did not allow the ticket agent to examine the suitcase. Cortinas then returned Hypolite's identification and tickets and informed both individuals that his investigation concerned narcotics, at which time Thomas and Hypolite became more noticeably nervous. Both Thomas and Hypolite denied that they were carrying any narcotics.

Cortinas then asked whether he could search Thomas's suitcase, and Thomas consented. After searching Thomas's suitcase, Cortinas asked whether he could search Hypolite's suitcase, and Hypolite leaned over the suitcase, looked up at Thomas (who was trying to ignore him), and asked for the key. Thomas stated he did not know what Hypolite was taking about and again told Cortinas that he did not know Hypolite. Cortinas then requested both men to accompany him to his office, which was around the corner.

In his office, Cortinas asked Hypolite if he could look in his suitcase. Hypolite responded that it was not his, and he did not mind. Cortinas then asked Thomas if the suitcase was his. Thomas denied that the suitcase was his and said he did not mind if Cortinas searched the suitcase. Cortinas then asked Hypolite why he was carrying a suitcase to which he did not have the key, and Hypolite responded that it was not his suitcase, it was Thomas's suitcase. In response to an additional question, both men again disclaimed ownership and stated that they did not care

if the suitcase was searched. The locks were forced open, and marijuana was seized. Cortinas stated that the questioning of the men in the ticket area took approximately five minutes, and the suitcase was searched within five minutes from the time they arrived at his office.

After seizing the marijuana, Cortinas asked Thomas if he could again search his suitcase. Although Cortinas did not articulate the reason, Cortinas noticed a brown shoe in the second suitcase that he believed matched a shoe he saw when searching Thomas's suitcase. After he discovered the matching shoe in Thomas's suitcase, he asked Thomas how the shoes were in the two different suitcases if the second suitcase did not belong to Thomas. Thomas responded that Cortinas planted the shoe there. At that time, both men were read their Miranda rights and arrested.

Hypolite testified in his own defense at both the suppression hearing and the trial. Hypolite testified that he was friends with Thomas when they lived in Grenada. After moving to the United States, Thomas asked Hypolite to visit him. During their visit, Thomas requested that Hypolite accompany him to San Antonio to visit his girlfriend. Hypolite consented and, based on Thomas's suggestion, used a suitcase provided by Thomas. Thomas packed another suitcase and a black bag. When the men arrived in San Antonio, they were met by Thomas's alleged girlfriend, who took them to a nearby hotel. Thomas left the room that night with the black bag, returning after Hypolite was asleep. Hypolite awoke the next morning and went to get breakfast to bring back to the room. The men went sightseeing during the day. Hypolite testified that Thomas used the phone often during their stay. The next morning, Hypolite awoke and went to get breakfast. When he returned, he asked Thomas for the key to the suitcase to pack his clothes. Thomas told Hypolite that Thomas had already packed his clothes, and Hypolite could use the black bag. Since Hypolite was ready for the airport earlier than Thomas, Thomas told him to go ahead and proceed to the airport. Thomas asked

Hypolite to take one of his suitcases with him, and Hypolite complied.

With regard to the testimony of Monge and Cortinas, Hypolite stated that he thought Monge was a police officer and that he was not free to leave. Hypolite also stated that Cortinas retained his identification and tickets when he asked Hypolite and Thomas to accompany him to his office. Hypolite stated that both he and Thomas were placed in separate rooms, and approximately one hour passed before the suitcase was opened. Hypolite stated that Thomas whispered to Hypolite that he should claim ownership of the suitcase, and Thomas later requested that Hypolite return to Grenada instead of standing trial.

### MOTION TO SUPPRESS

In his first and second points of error, Hypolite contends that the trial court erroneously denied his motion to suppress. Hypolite asserts that the search was conducted without a warrant and during an illegal detention that was not supported by specific articulable facts sufficient to constitute reasonable suspicion. Hypolite argues that he consistently refused to grant permission to search the suitcase. The State counters that Hypolite has failed to establish standing to contest the search of the suitcase because he failed to establish a reasonable expectation of privacy in the suitcase. We agree with the State.

 In reviewing the trial court's ruling on the motion to suppress, we afford deference to the trial court's determination of the historical facts, but we decide de novo whether the trial court erred in misapplying the law to those facts. *Guzman v. State,* 955 S.W.2d 85, 87–88 (Tex.Crim.App.1997). Although Hypolite asserted both a state and federal constitutional challenge to the search, he has failed to distinguish between the level of protections afforded by the state and federal constitutions; therefore, we consider his arguments together in the manner in which he has briefed them. *Riddle v. State,* 888 S.W.2d 1, 7–8 (Tex.Crim.App.1994), *cert. denied,* 514 U.S. 1068, 115 S.Ct. 1701, 131 L.Ed.2d 563 (1995); *Hackleman v. State,* 919

S.W.2d 440, 445 (Tex.App.—Austin 1996, pet. ref'd, untimely filed).

 In order to challenge the validity of a search, Hypolite had the burden of proving that he had a legitimate expectation of privacy in the suitcase such that his Fourth Amendment rights had been violated. *Rakas v. Illinois,* 439 U.S. 128, 139–40, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *De Jesus v. State,* 917 S.W.2d 458, 460 (Tex.App.—Houston [14th Dist.] 1996, pet ref'd). In order to meet this burden, Hypolite was required to show that: (1) he had a subjective expectation of privacy in the suitcase; and (2) society would recognize his subjective expectation as objectively reasonable. *United States v. McBean,* 861 F.2d 1570, 1574 (11th Cir. 1988); *De Jesus,* 917 S.W.2d at 460.

 In this case, Hypolite checked the bag as his own. When asked for permission to search the bag by Monge, Hypolite stated that the key to the bag was in Thomas's possession. Hypolite later stated that the bag belonged to Thomas. After requesting that Hypolite wait by the ticket counter for Thomas, Hypolite retained possession of the suitcase. When asked for permission to search the suitcase by Cortinas, Hypolite bent toward the suitcase as if to open the suitcase and then asked Thomas for the key. Other cases that have addressed this issue are helpful in determining whether Hypolite demonstrated a subjective expectation of privacy by his actions in this case.

In *De Jesus,* the defendant entered the airport and dropped her luggage. 917 S.W.2d at 460. An officer visually inspected the bags, noticing that they were heavy and smelled like coffee, a substance commonly used to mask the odor of narcotics. *Id.* A trained narcotics dog was brought to the area and made a positive "alert" on the luggage. *Id.* When the defendant was located in an airport restaurant and questioned about the luggage, she responded that she did not own the suitcases, but was carrying them for a friend. *Id.* The defendant accompanied the officer to the luggage and consented to having them opened. *Id.*

With regard to standing, the Houston court in *De Jesus* recognized that a subjec-

tive expectation of privacy may be established by the assertion of a possessory interest in luggage through a bailment. 917 S.W.2d at 461. The court noted that the defendant claimed she was carrying the suitcases for a friend and placed her name on the suitcases. *Id.* In addition, the court concluded that based on the nature of the bailment, the defendant's expectation of privacy was objectively reasonable. *Id.*

In *De Jesus,* the Houston court relied in great part on the holding in *United States v. Benitez–Arreguin,* 973 F.2d 823 (10th Cir. 1992). In that case, the Tenth Circuit held that a bailee could have a legitimate expectation of privacy in luggage. *Id.* at 827–28. The court was careful, however, to distinguish its holding in *Benitez–Arreguin* from other bailment cases in which the defendant "wholly eschewed any interest in or knowledge of the searched property ... because [in *Benitez–Arreguin* ] the defendant on the contrary testified that he had not wanted the bags searched because he was in charge of them." *Id.* at 828–29.

One of the cases distinguished by the Tenth Circuit in *Benitez–Arreguin* was *United States v. McBean,* 861 F.2d 1570 (11th Cir.1988). In that case, the defendant responded to inquiries regarding the ownership and contents of certain luggage by stating that the luggage was not his and disclaiming any knowledge as to its contents. *Id.* at 1572 & n. 3. The Eleventh Circuit held that the defendant failed to manifest a subjective expectation of privacy by stating "without reservation and unequivocally that the luggage was not his, and that he did not know what the luggage contained." *Id.* at 1574.

Similarly, in *United State v. Torres,* 949 F.2d 606, 607 (2nd Cir.1991), the defendant responded to questioning about a shoulder bag she was carrying by stating that the bag was her mother's and she had no knowledge of its contents. In response to a request to search the bag, the defendant responded, "it's not my bag, you can search it if you want to." *Id.* The Second Circuit noted that the defendant's lack of standing constituted "an independent ground for reversal of the suppression order." *Id.* at 608. The court noted that disclaiming or abandoning proper-

ty can result in a loss of legitimate privacy interests, "especially when actions or statements disavow any expectation of privacy." *Id.* The court further stated that "[n]either possession nor ownership of property establishes a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others." *Id.* The court concluded:

> [The defendant] made repeated statements that the shoulder bag did not belong to her but to her mother. She also disclaimed any knowledge of its contents and expressed indifference about the exclusion of others when asked for consent to a search. Thus, she lacked standing to assert a protected privacy interest.

*Id.* at 608–09.

In *United States v. Monie,* the defendant was hired to drive a rented automobile with two locked suitcases in the trunk to a Midwest destination. 907 F.2d 793, 793–94 (8th Cir.1990). A state trooper stopped the automobile for speeding. *Id.* at 794. Another trooper arrived on the scene, and the driver, a woman who accompanied the defendant on the trip, consented to the troopers' search of the passenger compartment and trunk. *Id.* When questioned about the suitcases in the trunk, the defendant "denied ownership, disclaimed any interest in their contents, and told the troopers he did not have the keys to the suitcases." *Id.* The troopers forcibly opened the suitcases and discovered cocaine. *Id.* The defendant did not object to the search. *Id.* The Eighth Circuit held that the defendant failed to show that he treated the locked suitcases as objects he sought to preserve as private. *Id.* The court noted that: (1) the defendant was merely hired to drive the car; (2) the defendant did not have permission to open the suitcases in the owner's absence or any means of access; (3) none of the defendant's belongings were in the suitcase; (4) the defendant did not object to the forced opening of the suitcases; and (5) the retention of the keys by the owner evidenced an intent to deny the defendant any control over the suitcases. *Id.* The court held that the defendant not only failed to exhibit a subjective expectation of privacy in the suitcases, he unequivocally disavowed any such expectation. *Id.* at 794–95.

In *United States v. Modica,* the defendant was arrested after he retrieved a suitcase from the lost baggage area in which heroin had been discovered by employees. 663 F.2d 1173, 1175–76 (2nd Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). The defendant asserted the suitcase was not his and that he had been framed by an airline employee, who indicated which bag the defendant should retrieve. *Id.* at 1176. The court noted as a threshold matter that the defendant lacked standing to object to the search of the suitcase. *Id.* at 1177. The defendant insisted throughout his trial and appeal that the suitcase was not his and he was duped into claiming it. *Id.* The court concluded that by his own admission, he could not have had any expectation of privacy as to the suitcase. *Id.*

■ The foregoing cases illustrate a fine line between the issue of whether a reasonable expectation of privacy exists and the issue of abandonment. Where ownership is abandoned or disclaimed prior to a search, no Fourth Amendment violation occurs because the defendant has no legitimate expectation of privacy in property that has already been abandoned. *Franklin v. State,* 913 S.W.2d 234, 240 (Tex.App.—Beaumont 1995, pet. ref'd). Where a privacy expectation has not been abandoned at the time of the search, however, the defendant may raise complaints regarding the search. *Id.*

■ In order for an abandonment to occur, the decision to abandon must not be the product of police misconduct. *Hernandez v. State,* 963 S.W.2d 921, 925 (Tex.App.—San Antonio 1998, pet. ref'd). Given the fine line between the issue of the existence of a reasonable expectation of privacy and the issue of abandonment, we find that a similar requirement should be imposed with regard to a disclaimer of a legitimate expectation of privacy. In other words, if the disavowal of the expectation of privacy which leads to its loss results from police misconduct, the disavowal may not be effective. Therefore, we explore the validity of Cortinas's actions prior to the search.

We conclude that the encounter between Hypolite and Cortinas was consensual based on the holding in *Hunter v. State,* 955 S.W.2d 102 (Tex.Crim.App.1997). In *Hunter,* the Court of Criminal Appeals held that an encounter "was not rendered a 'detention' simply by virtue of the fact that the officers asked for appellant's identification and requested to search his bag." *Id.* at 104. The Court asserted that the dispositive question was "whether the officers conveyed a message to appellant that compliance with their requests was required." *Id.* The court noted that the officers were dressed in plain clothes, and their weapons were not visible. *Id.* They identified themselves as police officers, with one officer standing apart. *Id.* Appellant was questioned about his travel plans, but his ticket was not retained. *Id.* The appellant was informed that he was not required to consent to the search, and no suggestion was made that a search warrant would be obtained if defendant did not consent to the search. *Id.*

■ Although the facts in *Hunter* are somewhat distinguishable from the present case, those distinctions do not turn the encounter at issue in this case into a detention prior to the search. Although Cortinas did not expressly state that Hypolite could refuse permission to search the bag, Hypolite denied ownership before the request was made so there would have been no reason to make such a statement. *See United State v. Gonzales,* 979 F.2d 711, 714 (9th Cir.1992). Furthermore, Cortinas's request that Hypolite accompany him to his office a short distance away after both men disclaimed ownership of the suitcase does not transform an otherwise consensual encounter into a fourth amendment seizure. *See United State v. Torres,* 949 F.2d at 608. Although Hypolite testified that he believed he was not free to leave, we must be persuaded that a reasonable person under these circumstances would have believed he was required to comply with Cortinas's requests. *Hunter,* 955 S.W.2d at 104. We are not so persuaded.

■ During a consensual encounter with Cortinas, Hypolite disclaimed any legitimate expectation of privacy in the suitcase. Therefore, he cannot complain that his Fourth Amendment rights were violated by the subsequent search of the suitcase. Hy-

polite's first and second points of error are overruled.

## ADMISSION OF POST-ARREST/DETENTION STATEMENT

In his third point of error, Hypolite asserts that the trial court erred in admitting his post-arrest/detention statement that was made after Cortinas's search disclosed the marijuana. Hypolite concedes that on cross-examination, he stated that he did not recall telling Cortinas, after the marijuana had been found, "something to the effect that Thomas had done the deal." Hypolite contends that the State should not have been permitted to rebut this statement with Cortinas's testimony that Hypolite had stated that the marijuana belonged to Thomas and that Thomas negotiated the deal and was responsible for having the marijuana there. Hypolite contends the admission of this testimony by Cortinas was erroneous because the statement was "not voluntarily made, but was the product of police interrogation while Hypolite was substantially deprived of his freedom through an illegal detention/arrest." The State counters that the statement was properly admitted for impeachment purposes.

■■■ We review a trial court's evidentiary rulings under an abuse of discretion standard. *Guzman*, 955 S.W.2d at 89; *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim.App.1990). Section 5 of article 38.22 of the Texas Code of Criminal Procedure provides that voluntary statements bearing on the credibility of the accused as a witness are admissible whether or not such statements resulted from custodial interrogation. TEX. CODE CRIM. PROC. art. 38.22, § 5 (Vernon 1979). Accordingly, statements given in violation of *Miranda* may be offered for purposes of impeaching a defendant's testimony, provided such statements are voluntary and have some bearing on the credibility of the defendant as a witness. *Soria v. State*, 933 S.W.2d 46, 58 & n. 19 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997); *Appling v. State*, 904 S.W.2d 912, 917 (Tex.App.—Corpus Christi 1995, pet. ref'd).

■■■ In his brief, Hypolite merely asserts that he did not receive his *Miranda* warnings

prior to making the statement in question. Statements are only involuntary where the statements are not the "product of a rational intellect and a free will." *See Soria*, 933 S.W.2d at 58 n. 19. Since Hypolite does not challenge the voluntariness of his statement in this manner, we need only consider whether the statement had some bearing on his credibility as a witness.

■■■ Hypolite's testimony centered on his absence of knowledge that the suitcase contained marijuana. His statement to Cortinas that Thomas negotiated the deal and was responsible for the marijuana in the suitcase has some bearing on the credibility of this testimony and on Hypolite's credibility as a witness. We conclude the statement made to Cortinas was admissible under section 5 of article 38.22 and overrule Hypolite's third point of error.

## FACTUAL SUFFICIENCY

In his fourth point of error, Hypolite contends the evidence is factually insufficient to support a finding that he *knowingly and intentionally* possessed marijuana as required for his conviction.

■■■ In reviewing the factual sufficiency of the evidence to support a criminal conviction, we must view all the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996). We are not free to reweigh the evidence and set aside the verdict merely because we feel that a different result is more reasonable. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim. App.1997). We may find evidence factually insufficient only where necessary to prevent manifest injustice. *Id.*

■■■ The testimony given by Hypolite and the witnesses for the State has been set forth in detail. Hypolite denied knowledge of the marijuana in his testimony, while Cortinas testified that Hypolite told him that Thomas had negotiated the deal and was responsible for the marijuana in the suitcase

after the marijuana was discovered. Furthermore, the State introduced evidence of Hypolite's nervous behavior, which drew the attention of both an experienced gate agent and an experienced narcotics officer. We are not free to reweigh this evidence. The jury's finding that Hypolite had knowledge of the marijuana was not manifestly unjust. Hypolite's fourth point of error is overruled.

CONCLUSION

The judgment of the trial court is affirmed.