Affirmed and Memorandum Opinion filed February 24, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00011-CR

___________________

 

Pedro Antonio Quintanilla, Appellant

 

V.

 

State of Texas, Appellee



 



 

On
Appeal from the 185th District Court

Harris County,
Texas



Trial Court Cause No. 1193961

 



 

 

MEMORANDUM OPINION

A jury convicted appellant, Pedro
Antonio Quintanilla, of capital murder.  The State elected not to seek the
death penalty; consequently, the conviction carried a mandatory life sentence
without the possibility of parole.  Appellant raises five issues on appeal.  We
affirm.

FACTUAL AND
PROCEDURAL BACKGROUND

I.                  
 The Shooting

On May 20, 2006, Norma Gonzales and Jose Perez, a
married couple, took their two young children to a restaurant called “Chilos”
after visiting Texas Children’s Hospital.  Perez was wearing an “old-style”
Astros jersey that had white, orange and navy blue colors.  They entered the
restaurant between 9 and 9:30 p.m. and ate dinner.  While at the restaurant,
Gonzales saw Santiago Salinas, a man she had dated briefly while a teenager. 
Her husband did not know Salinas.  

After eating, the family walked out to the parking
lot at around midnight.  As Perez opened his car door, a person approached and
shot him.  Perez was shot twice, once in the right shoulder and once in his
back.  The bullets were hollow point. 

The gunman fled on foot and got into a waiting car,
which a witness described to police.  Perez died that night from his wounds.  

II.              
 The Initial Investigation

Officers of the Houston Police Department (“HPD”) investigated
various motives for murdering Perez, including robbery, marital infidelity, or
any altercations Perez may have had.  The police determined that Perez was not
killed for any of those reasons.  Chilos’ parking lot security video captured
the shooting.  Gonzales worked with a sketch artist to create a rendition of
the shooter’s appearance.  That sketch was released to the media and placed on
a billboard with a request for information about the shooting.  The video of
the shooting and the witness’s description of the getaway car were also
released to the media.  No information was forthcoming, however, and eventually
the case was considered by police to be dormant.  

In early 2007, a Pasadena, Texas police officer
contacted HPD about an informant who might have some information about Perez’s
murder.  The informant claimed that Perez was shot because the shooter believed
he was Santiago Salinas.      

III.           
 Eloy Garcia’s Information

A separate informant, Eloy Garcia, was cultivated in
2008.  He testified that he had seen the media reports about Perez’s killing in
2006 and immediately suspected his acquaintances, Michael Belmarez and
appellant, were involved because the description of the getaway car matched
Belmarez’s car.  Garcia also saw the billboard with Gonzales’ sketch and
believed it looked like appellant.  Garcia knew Belmarez and appellant were friends
because he had seen them at social gatherings together.    

Garcia testified that he and appellant had a
conversation during a party in June 2006.  During that conversation, appellant
confessed the guilt about being involved in Perez’s killing was “eating him up.” 
Garcia stated that a couple of months later, appellant admitted he shot Perez.   


After the June 2006 party, Steve Torres, an associate
of Belmarez and appellant, approached Garcia about becoming a bodyguard for
him.  Garcia eventually agreed to accept the position.  Garcia testified that part
of his job was to occasionally look for Salinas because someone had ordered a
“hit” on him.    

In November of 2006, Garcia stated Torres contacted
him and told Garcia to come to the Baymont Inn hotel because he had found
Salinas.  When Garcia arrived, he saw Jaime Zamora.  Garcia testified he knew
Torres worked for Zamora; both were employed by a Mexican cartel known as the
Zetas.  Torres and Zamora told Garcia to leave the scene.  The following day,
Garcia learned from media reports that Salinas was killed at the Baymont Inn
the night before.  

In July 2008, Special Agent Kyle English of the
Bureau of Alcohol, Tobacco, and Firearms (“ATF”) made contact with Garcia, whom
Special Agent English suspected of illegally acting as a straw purchaser of
weapons.  Garcia eventually confessed to Special Agent English that he was
buying weapons for Jaime Zamora, whom English did not know and had never
investigated.  Garcia agreed to become a confidential informant for the ATF.  Special
Agent English testified ATF did not pay Garcia or promise he would not be
prosecuted in exchange for his services.  Special Agent English contacted HPD
to see if Zamora was already under investigation.  HPD was investigating, so Special
Agent English allowed Garcia to be used as an informant for HPD as well.  

IV.            
 HPD Investigation of Appellant

Garcia agreed to work with HPD to get a recorded
confession from appellant about Perez’s murder.  There were two separate
occasions in October 2008 when Garcia recorded conversations with appellant.  The
first was not effective because there was too much background noise to hear
appellant clearly.  Portions of the second recording were admitted into
evidence over several objections by appellant’s attorney.  Garcia also
testified during the trial.  He stated that appellant received “15 to 1400”
dollars as remuneration for the killing.  Garcia stated appellant used the
money to buy new clothing and rims for his car.  According to Garcia, appellant
also explained he was told to shoot a person wearing a “throwback Astros
jersey,” which Garcia defined as having orange coloring and blue stars.  Garcia
testified appellant claimed he used hollow point bullets.  Appellant also
stated that the shots were “all body shots.”  

V.               
 The Custodial Interrogation

Based upon the recording, Officer Todd Miller of HPD
received an arrest warrant for appellant.  HPD arrested appellant at
approximately 7:15 a.m. on December 2, 2008.  Appellant testified that he had
drunk “a 12-pack with [his] cousin the night before” and had gone to sleep at
about 3:00 a.m.  At the time he was arrested, he was asleep or near sleep. 
Nonetheless, appellant testified he was not intoxicated when he awoke and that
he was awake at the time of the interview.  

At approximately 9:23 a.m., Officer Miller interviewed
appellant without audio or video recording the discussion.  Twelve minutes
later, Officer Miller began recording the interview.  He started the interview by
reading appellant his Miranda[1]
rights which appellant verbally waived.  Appellant then confessed that he shot
Perez.  

Appellant and Officer Miller, however, have differing
accounts about what happened during the unrecorded twelve minutes.  Appellant
testified on direct examination that during that time, Officer Miller did not inform
appellant regarding his Miranda rights.  During cross-examination, however, he
testified that Officer Miller did Mirandize him, but that Officer Miller said
that appellant did not need to pay attention because “you’re cooperating with
me.”  

Regardless of whether he was Mirandized, appellant
stated that he asked on his own initiative to call his mother so she could find
him an attorney.  Appellant testified Officer Miller then stepped out of the
interrogation room, but returned and acted like nothing had happened. 
Appellant also testified that Officer Miller said he was facing life in prison
or the death penalty if he did not cooperate.  Appellant also averred that Officer
Miller said if he cooperated, he would be permitted to go home because Officer
Miller was “really interested in Zamora and Torres because they are . . . the
flames [he] want[ed] to extinguish and put out for good and [appellant was]
just . . . a fume.”  

Officer Miller contends that he began the unrecorded
interview by reading appellant his Miranda rights, which appellant understood
and waived.  Officer Miller testified that appellant never requested an
opportunity to call his mother or a lawyer.  Officer Miller denied that he ever
said appellant could go home if he cooperated.  

VI.            
 Appellant’s Testimony at Trial

Appellant testified at the guilt/innocence phase of
the trial that he did shoot Perez.  He testified he was friends with Belmarez, who
was distantly related to Torres by marriage.  Torres approached Belmarez and
appellant about kidnapping or killing Salinas in the beginning of May 2006. 
Appellant claimed he did not want to participate and informed Torres of his
decision, but that Torres called repeatedly to pressure him.  

On May 20, 2006, appellant testified that Torres began
calling him at 10:00 a.m.  Eventually, appellant chose to turn off his cell
phone to avoid Torres’ calls.  He also admitted he consumed cocaine that day to
manage the stress Torres caused.  At approximately 10:30 p.m., Torres and
Belmarez arrived at appellant’s residence.  According to appellant, Torres then
coerced him to ride in Belmarez’s car.  

Belmarez and appellant left appellant’s home and
drove to Chilos, carrying firearms Torres had given Belmarez.  Torres contacted
them on a cell phone and informed them that the man he wanted kidnapped or
killed was wearing an “old school” Astros jersey.  Belmarez entered the
restaurant to confirm that the person was present.  Appellant testified that when
Perez left the restaurant wearing the Astros jersey, appellant shot him, ran to
the car, and Belmarez drove the car to Belmarez’s residence.  

The following day, Torres paid appellant
approximately $1,400, but informed him the wrong person had died, so appellant
and Belmarez would need to kill again.  Appellant testified that he later
refused to take part in another killing because he “manned up to [Torres].”
Appellant claims Torres told him in response, “If you tell somebody what we’re
doing, you know, you can get killed or something can happen to your family . .
.” 

On cross-examination, appellant stated that he owed
Torres approximately $1,400 and he believed that some or all of the debt would
be erased if he committed the killing, although he never had an explicit
understanding with Torres.  Appellant claimed that it was a surprise when
Torres paid him $1,400 for his services.  He also admitted that Torres never
threatened him with serious bodily injury or death to force him to perform the
killing.  

DISCUSSION

I.                  
Did the Trial Court Err By Admitting Appellant’s Confession?

Appellant contends his confession to Officer Todd
Miller was not voluntary because (1) he requested an opportunity to call his
mother so she could hire a lawyer; (2) Miller engaged in scare tactics designed
to coerce an involuntary confession; and (3) Miller promised that if he
“cooperate[d],” appellant would be permitted to “go home.”  

A.     Standard
of Review

In a motion to suppress hearing, the trial court is
the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given to their testimony.  State v. Ross, 32 S.W.3d 853,
855 (Tex. Crim. App. 2000).  Accordingly, the judge may believe or disbelieve
all or any part of a witness’s testimony, even if that testimony is not
controverted.  Id.  When reviewing a trial court’s ruling on a motion to
suppress, we defer to the trial court’s interpretation of historical facts.  See
Hypolite v. State, 985 S.W.2d 181, 185 (Tex. App.—San Antonio 1998, no
pet.) (citing Guzman v. State, 955 S.W.2d 85, 87-88 (Tex. Crim. App.
1997)).  However, we review de novo the trial court’s application of law
to facts.  Herrera v. State, 194 S.W.3d 656, 658 (Tex. App.—Houston
[14th Dist.] 2006, pet. ref’d); see also Mayes v. State, 8 S.W.3d 354,
358 (Tex. App.—Amarillo 1999, no pet.)

An accused person’s statements may be used against
him if “it appears that the same w[ere] freely and voluntarily made without
compulsion or persuasion.”  Tex. Crim. Proc. Code Ann. § 38.21 (West 2010).  We
determine whether a confession has been made voluntarily under the totality of
the circumstances.  Delao v. State, 235 S.W.3d 235, 238 (Tex. Crim. App.
2007).  

B.      Analysis

Appellant argues that his confession was not voluntary
because he was coerced.  In his appellate brief, he argues that he was “not a
strong and determined person,” and he had no understanding of the criminal
justice system.  As a result, when he allegedly requested a telephone call to
his mother, he believed he had a right to call her.  Appellant also contends he
believed Officer Miller when Miller allegedly stated that he should not pay
attention to the Miranda warnings.  Officer Miller testified that appellant’s
claims of coercion did not occur.  

The trial court made findings of fact on the record,
specifically that: (1) appellant received his Miranda warnings and waived them;
(2) appellant was not under the influence of any intoxicating substance at the
time of the interrogation; (3) Officer Miller did not make any promises to
appellant that he would be released from custody if he cooperated; and (4)
appellant never requested an attorney.  

All of the trial court findings are supported by the
testimony of Officer Miller and, with respect to Finding 2, appellant’s
testimony.  It is within the trial court’s sole discretion to determine which
witnesses to believe.  See Ross, 32 S.W.3d at 855.  As an appellate
court we are bound by these findings.  See Hypolite, 985 S.W.2d at 185. 
Furthermore, the “scare tactics” Officer Miller allegedly engaged in were the
truth — appellant was facing capital murder charges, with the consequences of
life in prison or the death penalty.  

Based upon the facts found by the trial court, we
also conclude there was no coercion on the part of Officer Miller and
appellant’s confession was voluntary.   Delao v. State, 235 S.W.3d at
238.  We overrule appellant’s first point of error.

II.              
Did Insufficient Evidence Exist to Support a Jury Verdict of
Capital Murder, or Did the Trial Court Err in Denying the Defendant’s Motion
for Directed Verdict Because There Was Not Sufficient Evidence of Remuneration?

Appellant argues in his second and fourth issues that
the State did not prove a case of capital murder because there was insufficient
evidence that appellant received remuneration for killing Perez.  

A.     Standard
of Review

Five judges on the Texas Court of Criminal Appeals
have determined that “the Jackson v. Virginia legal-sufficiency standard
is the only standard that a reviewing court should apply in determining whether
the evidence is sufficient to support each element of a criminal offense that
the State is required to prove beyond a reasonable doubt.”  Brooks v. State,
323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality opinion).[2]  As a result, we
construe all of appellant’s sufficiency arguments as a legal sufficiency
challenge.

In a sufficiency review, we view all evidence in the
light most favorable to the verdict and determine whether any rational trier of
fact could have found the essential elements of a crime beyond a reasonable
doubt.  Salinas v. State, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). 
The jury, as the sole judge of the credibility of the witnesses, is free to
believe or disbelieve all or part of a witness’ testimony.  Jones v. State,
984 S.W.2d 254, 257 (Tex. Crim. App. 1998).  The jury may reasonably infer
facts from the evidence presented, credit the witnesses it chooses to,
disbelieve any or all of the evidence or testimony proffered, and weigh the
evidence as it sees fit.  Sharp v. State, 707 S.W.2d 611, 614 (Tex.
Crim. App. 1986).  Reconciliation of conflicts in the evidence is within the
jury’s discretion and such conflicts alone will not call for reversal if there
is enough credible evidence to support a conviction.  Losada v. State,
721 S.W.2d 305, 309 (Tex. Crim. App. 1986).  An appellate court may not reevaluate
the weight and credibility of the evidence produced at trial and in so doing
substitute its judgment for that of the fact finder.  King v. State, 29
S.W.3d 556, 562 (Tex. Crim. App. 2000).  Inconsistencies in the evidence are
resolved in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406
(Tex. Crim. App. 2000).  We do not engage in a second evaluation of the weight
and credibility of the evidence, but only ensure the jury reached a rational
decision.  Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris
v. State, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet.
ref’d.).

One of the ways that a person commits capital murder is
“the person commits the murder for remuneration or the promise of remuneration
. . .” Tex. Penal Code § 19.03(a)(3) (West 2010).  Remuneration is undefined by
the statute, but Black’s Law Dictionary defines remuneration as “payment” or
“compensation.”  Black’s Law Dictionary
1322 (8th ed. 2004).  The statute does not require the State to
prove appellant received a promise of payment from Torres, only that appellant
committed the act “for remuneration.”  Tex. Penal Code § 19.03(a)(3).  This definition
is in accordance with the language of the statute, which permits capital murder
charges for a “killing of any person in order to receive, or for the purpose of
receiving some benefit or compensation.  Thus, the focus of the criminal
culpability is upon the actor’s state of mind.”  Beets v. State, 767
S.W.2d 711, 734 (Tex. Crim. App. 1987) (citing McManus v. State, 591
S.W.2d 505, 513 (Tex. Crim. App. 1979)(overruled on other grounds)).  

At the trial, Garcia testified that appellant told
him that he received “more or less 15 to 1400 [dollars]” for the killing. 
Garcia further stated that appellant bought rims for his car and clothing with
the money.  Appellant makes a similar statement in the recorded conversation
with Garcia.  Appellant testified on direct examination that he did not expect
the payment of the money.  On cross-examination, however, appellant admitted
that he owed Torres approximately $1,400 and expected a reduction or
forgiveness of his debt because he committed the act.  In fact, the following
exchange occurred between the prosecutor and appellant:  

Q:  And ahead of time, before you did that killing, you
knew that you were going to benefit from doing this killing, that you were
going to erase your debt or get paid or both, right?

A:  Not get paid, but probably just erase my debt with him.

Q:  Okay.  Which is cash money, isn’t it?

A:  Yes, ma’am.

Q:  From Steven Torres, isn’t it?

A:  That’s correct.

Q:  And that’s pretty much what capital murder is, isn’t
it?

A:  Yes, ma’am. 

Even if the jury believed appellant did not expect
payment of cash prior to committing the crime, appellant admitted he did expect
a reduction or erasure of his debt to Torres.  We conclude there was sufficient
evidence to support the jury’s finding that appellant murdered Perez for
remuneration.  Appellant’s second point of error is overruled.  To the extent
appellant’s fourth point of error involves sufficiency of the evidence of
remuneration, it is also overruled.

III.           
 Did the Trial Court Err in Denying a Directed Verdict Because
Appellant Proved an Affirmative Defense of Duress?

Appellant argues he should have received a directed
verdict because he proved that he committed the killing under duress.

A.     Standard
of Review

We review
this point of error under the sufficiency standards listed in Part II above.

B.      Analysis

The affirmative defense of duress is appellant’s
burden, which he must show by a preponderance of the evidence.  See Tex.
Penal Code §2.04(d).  Duress exists if “the actor engaged in the proscribed
conduct because he was compelled to do so by threat of imminent death or
serious bodily injury to himself or another.”  Tex. Penal Code § 8.05(a).  

Appellant testified he felt “paranoid” and “like
threatened in a way” by Torres’ phone calls to him.  In his brief, he also
notes that “[i]n this world of the streets, the world of the Cartel, threats
are not made but implied.”  Duress is not proven by a general sense another
person might become violent.  Cameron v. State, 925 S.W.2d 246, 250
(Tex. App.—El Paso 1995, no pet.) (knowledge of a person’s temper does not
create duress).  

Appellant admitted on cross-examination that Torres
never made any direct threats of violence to him or any other party if
appellant did not complete the killing.  Furthermore, appellant testified he
turned down Torres’ request to commit a second murder because he “manned up to
him.”  The fact that Torres instructed appellant and provided him with the tools
necessary to commit the act does not create duress.  Id. (“The fact that
a defendant is taking orders from another . . . is not sufficient to raise the
defense of duress.”)  

The jury received instructions on the affirmative
defense of duress.  Thus, we conclude the jury could reasonably choose to
believe appellant was not under duress at the time of the shooting. 
Appellant’s fourth point of error is overruled.

IV.            
 Did The Trial Court Abuse its Discretion by Admitting Portions
of the Recording Between Appellant and Garcia over Defense Counsel’s
Objections?

Appellant claims the trial court erred in admitting
some of the statements recorded by Garcia.  We will address each objection in
turn.

A.     Standard
of Review

An appellate
court reviews a trial court's decision to admit or exclude evidence under an
abuse of discretion standard. Cameron v. State, 241 S.W.3d 15, 19 (Tex.
Crim. App. 2007).  A trial court abuses its discretion when its decision is so
clearly wrong as to lie outside that zone within which reasonable persons might
disagree. McDonald v. State, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).
 An appellate court should uphold a trial court's admissibility decision when
that decision is within the zone of reasonable disagreement because trial
courts are in the best position to decide questions of admissibility. Cameron,
241 S.W.3d at 19.  An appellate court may not reverse a trial court's
decision regarding the admissibility of evidence solely because it disagrees
with the decision.  Id.

Evidence is relevant if it has “any tendency to make
the existence of any fact that is of consequence to the determination of the
action more probable or less probable than it would be without the evidence.” Tex.
R. Evid. 401.  Evidence that is not relevant is not admissible. Tex. R. Evid.
402.  The trial court's determination of relevancy will not be reversed absent
an abuse of discretion. Reese v. State, 33 S.W.3d 238, 240 (Tex. Crim.
App. 2000).  

However, relevant evidence may be excluded from the
record if its probative value is “substantially outweighed by the danger of
unfair prejudice.” Tex. R. Evid. 403; Andrade
v. State, 246 S.W.3d 217, 227 (Tex.App.-Houston [14th Dist.] 2007, pet. ref’d).
Therefore, upon further objection from the opponent of the evidence based on
Rule 403, the trial court must weigh the probative value of the evidence
against the potential for unfair prejudice. Andrade, 246 S.W.3d at 227
(citing Montgomery v. State, 810 S.W.2d 372, 389 (Tex.Crim.App.1990)).
Evidence is unfairly prejudicial when it has an undue tendency to suggest an
improper basis for reaching a decision. Reese, 33 S.W.3d at 240. There
is a presumption relevant evidence is more probative than prejudicial. Andrade, 246 S.W.3d at 227
(citing Santellan v. State, 939 S.W.2d 155, 169 (Tex.Crim.App.1997)).
The trial court's ruling whether to exclude evidence under Rule 403 is also
measured by an abuse of discretion standard and will not be reversed if the
ruling is within the zone of reasonable disagreement.  Id.

B.      Statements
By Appellant

1.       “I’ll
Find a Way Out . . .”

Appellant argues the trial court erred by admitting the
statement “I’ll find a way out . . .” on the grounds that the statement was
irrelevant and prejudicial to the point of outweighing probative value. We
presume appellant objected to the entire statement, which was as follows:  “I’m
a good-ass motherfucking fool who would find his way out of this shit without
even having to snitch on nobody.  Anybody come at me with some shit like, I’ll
go, I want to see the footage.  I’ll go, I want to see whatever, you know.  Why
does everybody in the fucking State of Texas you all got to come at me?”

We conclude the trial court acted within its
discretion when determining the evidence is relevant because the discussion of
“finding his way out” without “snitching” and his reference to the “footage” makes
it “more probable” that appellant had some involvement in the crime.  See
Tex. R. Evid. 401 (relevant evidence is any evidence that has “any tendency to
make the existence of any fact that is of consequence to the determination of
the action more probable or less probable than it would be without the
evidence”); Cameron, 241 S.W.3d at 19.   We further conclude the trial
court did not abuse its discretion by determining there was not unfair
prejudice requiring exclusion of the statement.  See Tex. R. Evid. 403;
Cameron, 241 S.W.3d at 19; Andrade, 246 S.W.3d at 227.  If
the jury chose to credit the statement, it would not have been on an improper
basis; rather, it would have been on the basis that appellant was part of the
crime.  See Reese, 33 S.W.3d at 240.

2.       “They
Don’t Have Anything on Me . . .”

Appellant argues that the declaration beginning “They
don’t have anything on me. . .” has no probative value.  We presume appellant
refers to the statement, “They ain’t got nothin’ on me, dog.  By now, fool, I
would have been done caught, fool.  Straight up . . . Needless to say, if they
would have told me, ‘You matched the description, we’re going to put you in the
lineup,’ you know.”

The standard for determining if a statement is
probative is whether it has “any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.” Tex. R. Evid. 401.  Under that
standard, appellant’s words can be interpreted as an assertion that he escaped
detection by the police because otherwise he would already have been arrested. 
It makes it more probable that appellant was part of the crime in question. 
The trial court acted within its discretion by admitting this evidence.  Cameron,
241 S.W.3d at 19.  

3.     
 “I Can’t Take It For Life,
They Might as Well Kill Me . . .”

Appellant contends this proclamation should not have
been admitted because it was irrelevant and not probative.  The full quote was
“I can’t take, like, being sentenced for life, dog, in prison or something like
that, you know.  I can’t take it like that, fool . . . You gonna sentence me
for life, might as well kill me.”

We conclude admission of this statement was within
the trial court’s discretion.  Cameron, 241 S.W.3d at 19.  The trial
court could have determined this assertion was relevant and probative because it
indicates appellant believed he could go to prison for life if convicted.  As a
result, the statement makes it more probable that appellant committed the
crime.  See Tex. R. Evid. 401.  

4.       “It
Could Have Been Anybody, Fool . . .”

Appellant argues that
this comment was not relevant and not probative.  The discussion focused on the
quality of Chilo’s parking lot surveillance video.  Appellant’s statement in
full was, “It could be anybody, fool, anybody.  Keep my name out their mouth.   It
could be anybody, fool, anybody.  Ain’t no way you could say, ‘Oh, that’s him. 
What the fuck?’  To me that looks like a fucking shadow, you know what I’m
saying.”

We conclude the trial
court acted within its discretion in admitting these statements.  Cameron,
241 S.W.3d at 19.  The declaration was
relevant because the context makes clear that appellant is happy about his belief
that nobody could be identified from the tapes, thus keeping his name “out
their mouth.”  Tex. R. Evid. 401.  Furthermore, the statements tend to make it
more probable than not that appellant participated in the crime.  Id.

5.     
 Discussion of Belmarez
“Snitching” On Appellant

Appellant argues that his discussion about Belmarez
“snitching” on him is not probative.  During the course of the tapes, appellant
states that Belmarez was the getaway driver, describes the crime, and articulates
reasons why law enforcement will not catch him.  Appellant appears concerned
that Belmarez might work with the police to convict him, as illustrated by the
statement, “He’s gonna snitch on me.”  

Under an abuse of discretion standard, we determine
that the conversation about Belmarez “snitching” could be probative because it
gives an indication of appellant’s culpability and made it more probable that
he committed it.  Tex. R. Evid. 401; Cameron, 241 S.W.3d at 19.  

6.      Appellant’s
Admission He Was Paid After The Crime

Appellant admitted on the tape recording that he
received $1,400 after Perez’s murder.  He explained he used the money to buy
rims and clothing, and that he looked “fly.”  Appellant now argues that he was
prejudiced because it gave “the prosecutor ammunition to classify him as a
murderer for hire who only wanted money for clothes.”

The State had the burden to prove appellant received
remuneration for the killing in order to prove its capital murder charge.  See
Tex. Penal Code § 19.03(a)(3).  Thus, appellant’s statement about receiving
money is relevant.  Tex. R. Evid. 401.  The prosecution initially attempted to
introduce the entire recording.  The defense objected on several grounds and
the trial court ruled part of the tape should be excluded.  After the prosecution
produced the final version of the recording, defense counsel presented additional
objections..  However, at that time, defense counsel made no objection to the statements
regarding use of the money received by appellant.  As a result, we conclude the
objection to use of the money was waived.   See Tex. R. App. P. 33.1(a).

7.       Irrelevant
Material

Appellant contends the recording contains “a large
amount of information that was irrelevant to the case, highly prejudicial talk
about how he spent the money, how no one could know that he did the crime,
“trash talk” which proved nothing but inflamed the jury.”  Appellant did not
make these claims to the trial court when the final recording was prepared. 
Consequently, appellant has waived these issues on appeal.  See Tex. R.
App. Proc. 33.1(a).  Even if he had not waived his objections on appeal, the point
of error lacks specificity regarding both the statements in question and
arguments against them.  Consequently, this court cannot review the trial
court’s ruling for error.  See Tex. R. App. Proc. 38.1(i).  

 We overrule all of appellant’s points of error
regarding the recorded conversations between appellant and Garcia.

V.               
Did the Trial Court Err By Denying Defense Requests for Inclusion
of a Definition of “Remuneration” and an Instruction on Duress in the Jury
Charge?

A.     Standard
of Review

We evaluate jury charge error under the Almanza v.
State standard.  686 S.W.2d 157, 171 (Tex. Crim. App. 1984). We first
determine whether error exists in the jury charge.  Hutch v. State, 922
S.W. 166, 171 (Tex. Crim. App. 1996).  If there is harm, we must then determine
what sort of harm exists.  Almanza, 686 S.W.2d at 171.  If error was
preserved, we must reverse if we conclude “some harm” occurred.  Id.  If
error was not preserved, we reverse only if the defendant suffered “egregious
harm.”  Id.

 Definition of Remuneration

Appellant requested the following instruction be
given to the jury:  “In determining whether murder was committed for
remuneration or promise thereof, focus of the criminal culpability is upon
defendant’s state of mind, that is, whether the evidence adduced at trial shows
the defendant expected to be paid and that he acted out of the expectation that
he would be paid.”  (6 RR 50)  

Appellant relies solely on a Fifth Circuit case for
his interpretation of the standards for remuneration.  See Beets v. Johnson,
180 F.3d 190 (5th Cir., 1999).  While we note that a Fifth Circuit case is
not binding on this court, we discuss the argument.  In that case, Beets was
convicted of capital murder for killing her husband to collect his life
insurance proceeds, pension, and estate.  Id. at 192.  Beets objected to
the jury instruction allowing her conviction for capital murder “if [the
murder] is committed for remuneration.”  Id. at 194.  Beets contended
the statutory language required her to “intentionally” or “knowingly” commit an
act of murder for the purposes of remuneration.  The Fifth Circuit disagreed,
concluding that a jury instruction that stated “the murder was committed for
remuneration” was sufficient.  Id. at 194.  

Similarly, the trial court in this case gave a jury
instruction that appellant should be found guilty if the appellant committed
murder “for remuneration from Steven Torres.”  We conclude that these instructions
are sufficiently similar and determine there is no conflict between the Beets
case and the instant one.  

Appellant also requested a change to the definition
of remuneration itself.  The court’s definition of remuneration was,
“‘Remuneration’ means a payment or benefit by one person to another in
compensation for a specific service or services rendered.”  Appellant requested
the definition state, “Remuneration means payment by one person to another
person in compensation for a specific service or services rendered pursuant to
an agreement.”    

The differences between these definitions are: (1) whether
remuneration can be payment or a benefit; and, (2) if the State must prove an
agreement for compensation existed.  The trial court overruled appellant’s
request, noting that it had structured its definition in accordance with the
Texas Penal Code and case law.  

The Texas Court of Criminal Appeals defined remuneration
in capital murder.  Remuneration occurs when an “actor kills a victim in order
to receive a benefit or financial settlement paid upon the death of the
victim.”  Beets v. State, 767 S.W.2d 711, 737 (Tex. Crim. App. 1987). 
Remuneration includes pure payment for a service, the victim’s life insurance
proceeds, or the victim’s estate.  See, e.g., id. at 734-35. 
Consequently, the trial court properly instructed the jury that remuneration
can be either a payment or a benefit received as a result of performing the
service of murder.  

Furthermore, the proper inquiry is whether the
appellant killed “in expectation of receiving some benefit or compensation.”  See
id. at 735.  Thus, requiring the jury to determine that a contractual
obligation existed would have been an incorrect statement of the law.  

We conclude there was no jury charge error relative
to the instruction for remuneration.  Consequently, we overrule appellant’s point
of error.

B.      Duress
Instruction

Appellant appears to argue that the duress
instruction in the jury charge was too narrowly constructed.  The trial court
gave the following instruction to the jury:  

It is an affirmative defense to prosecution for any offense
that the person charged engaged in the proscribed conduct because he was
compelled to do so by the threat of imminent death or serious bodily injury to
himself or another.  Such compulsion exists only if the force or threat of
force would render a person of reasonable firmness incapable of resisting the
pressure.  (CR 59)

This instruction follows the language in the Texas
Penal Code almost exactly.  See Tex. Penal Code § 8.05(a), (c).  

In the application paragraph, the trial court stated:

“[If you] find by a preponderance of the evidence that
Steven Torres had threatened to kill or cause serious bodily injury to the
defendant if he did not participate in [the capital murder], . . . and that the
defendant was in fear of imminent loss of his life or serious bodily injury at
the hands of Steven Torres if he did not participate in the said offense and
that so believing, he did participate, then you will acquit the defendant and
say by your verdict ‘Not Guilty.’” (CR 59)

Appellant requested the following instruction be
added by the trial court, although he did not state where in the jury
instructions:  “[b]y a preponderance of the evidence that Steven Torres had
threatened to kill or cause bodily injury to the defendant explicitly or
implicitly.”  (5 RR 61)  The difference between the trial court’s and
appellant’s instructions is the word “implicitly.”  

A trial court should use the words and phrases
provided by the legislature in constructing jury charges.  Arline v. State, 721
S.W.2d 348, 352 n.4 (Tex. Crim. App. 1986).  The Texas Penal Code does not use
the term “implicit” or “implicitly” in its definition of duress.  See Tex.
Penal Code § 8.05.  The proper inquiry in determining the validity of a duress
defense is appellant’s belief that he or another faced imminent death or bodily
injury if he did not perform the killing.  See Tex. Penal Code §
805(a).  The trial court’s use of the statutory language was appropriate and
correctly stated the law.  See Arline, 721 S.W.2d at 352 n.4. 
Consequently, the trial court did not err in overruling appellant’s request for
a change to the instructions on duress.

We conclude the trial court did not err by rejecting
appellant’s requests for changes in the jury charge and thus overrule all of
his points of error regarding jury charge instructions.

CONCLUSION

Having overruled all of appellant’s points of error,
we affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Seymore, and McCally.

Do Not
Publish — Tex. R. App. P. 47.2(b).









[1] Miranda v. Arizona, 384
U.S. 436 (1966).





[2] Nonetheless, this does
not alter the constitutional authority of the intermediate courts of appeals to
evaluate and rule on questions of fact.  See Tex. Const. art. V, § 6(a) (“[T]he decision of [courts of
appeals] shall be conclusive on all questions of fact brought before them on
appeal or error”).