**UNITED STATES of America, Plaintiff,**

v.

**Carlos ALCAREZ–MORA, Defendant.**

**No. 02–40126–SAC.**

United States District Court, D. Kansas.

Feb. 26, 2003.

Melody J. Evans, Topeka, KS, for Plaintiff.

Thomas G. Luedke, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on the following motions:

defendant's motion to suppress evidence (Dk.20); defendant's motion to suppress statements (Dk.19); defendant's motion for admission of additional exhibits (Dk.37); the government's motion for admission of transcript (Dk.43); and de-

fendant's motion for *Simmons* immunity (Dk.)

In the motion to suppress evidence, defendant challenges the legality of the initial traffic stop, and the validity of his consent to search, contending he does not understand sufficient English to have rendered valid consent. In the motion to suppress statements, defendant alleges that all his incriminating statements made post-Miranda were coerced, and that some of his statements are protected by the marital privilege. The court, having held an evidentiary hearing on January 16, 2003, is now ready to rule.

## FACTS

On October 17, 2002, at approximately 1:08 p.m., Junction City Police Officer James Oehm was patrolling I–70 in Geary County, Kansas, when he saw a Chevy Suburban traveling eastbound. Officer Oehm followed the vehicle, then pulled alongside it and noticed sunlight reflecting off a crack and into the driver's line of sight. Officer Oehm was aware that Kansas law prohibits driving a vehicle with a damaged front windshield which substantially obstructs a clear view of the highway, *see* K.S.A. § 8–1741(b), and stopped the vehicle to determine whether a traffic violation had occurred. Defendant challenges the legality of this initial stop.

Officer Oehm then approached the passenger side of the vehicle, saw a passenger later determined to be defendant's wife, and noticed three children and two dogs in the vehicle. Officer Oehm advised the occupants of the purpose of the stop, and requested in English a driver's license and proof of insurance. Defendant produced his driver's license, and defendant's daughter, after some conversation in Spanish with defendant, stated in English that the insurance was not in the vehicle. Officer Oehm asked defendant in English where he was going, and defendant responded

"Alabama." Officer Oehm then took defendant's driver's license and returned to his patrol car.

After writing a warning ticket and reviewing the documents, Officer Oehm returned to defendant's vehicle and asked defendant to step to the rear of the vehicle, which he did. Officer Oehm returned defendant's driver's license and gave defendant the warning citation, explaining that it was merely a warning. Officer Oehm then had a conversation with defendant during which he alleges and defendant denies that defendant consented to the officer's search of the vehicle.

The search uncovered a quantity of methamphetamine in the vehicle. Defendant was arrested, Mirandized, and taken to the police station along with his family. Defendant waived his Miranda rights, and he and his wife were interviewed by officers. Their interview was recorded by video camera in an interview room. At one point during the interview, officers left defendant alone with his wife, and incriminating statements were then made, which were audio recorded. Defendant alleges that all his statements and those of his wife were coerced, and that any statements made when the officers were not in the room are protected from disclosure by the marital privilege.

**● Motion to Suppress Evidence**

In this motion, defendant contends that the initial stop of his vehicle was illegal, and that his consent to the officer's search of the vehicle was not valid because defendant does not speak or understand sufficient English.

**A. Legality of Initial Stop**

A traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Zubia–Melendez,* 263 F.3d 1155, 1160 (10th Cir.2001). For the stop to be constitutionally reasonable, the officer must have either " '(1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' " *Id.* (quoting *United States v. Ozbirn,* 189 F.3d 1194, 1197 (10th Cir. 1999)). The constitutional reasonableness of a traffic stop does not depend on the officer's actual motive in conducting the stop. *Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Here, defendant suggests that Officer Oehm could not have detected a crack in defendant's windshield while following defendant's vehicle because the vehicle's back windows were darkly tinted, the vehicle's two back doors had a middle frame on them, and the vehicle was carrying two adults, three children, two dogs, and a significant amount of luggage. Defendant alleges that because of Officer Oehm's distant and obscured view, he could not have seen the crack in the windshield. Defendant further contends that even if the officer could have seen the crack in the windshield, the size and placement of the crack failed to give rise to a reasonable suspicion that the crack substantially obstructed defendant's vision.

Officer Oehm testified to his knowledge of the Kansas statute providing:

(b) No person shall drive any motor vehicle with a damaged front windshield or side or rear windows which substantially obstructs the driver's clear view of the highway or any intersecting highway.

K.S.A. § 8–1741.

The Tenth Circuit recently examined this statute under similar facts. In affirming the court's refusal to suppress evidence, the Court stated:

Streeter's windshield had a crack about 12 inches across and 6 inches high, large enough that Officer Voigt could view it from behind the car. This gave Officer Voigt reasonable articulable suspicion— "a particularized and objective basis"— to believe that the crack substantially obstructed Streeter's view of the street. [U.S. v. ]Cortez, 449 U.S. at 417–18, 101 S.Ct. 690[, 66 L.Ed.2d 621 (1981)]. It is irrelevant whether the observed crack was, in fact, large enough to constitute a violation of the law. United States v. Cashman, 216 F.3d 582, 587 (7th Cir. 2000) (holding that a cracked windshield provided probable cause for a stop even if the crack was not actually large enough to violate the law). The traffic stop was therefore justified, and the district court did not err in denying Callarman's motion to suppress.

United States v. Callarman, 273 F.3d 1284, 1287 (10th Cir.2001).

Officer Oehm's testimony at the evidentiary hearing was credible and undisputed. He testified not only that he followed defendant's vehicle, but also that he pulled alongside it. As he looked through his windshield and defendant's window, he saw a crack in defendant's windshield which he believed was reflecting the sunlight into the vehicle. Government's Exhibits 1 and 2 show that the crack extended the entire length of the driver's side of the windshield horizontally, angling toward the center of the windshield.

Defendant testified that the crack never interfered with his vision while driving, as it was below his line of sight, but the court finds this immaterial. The crack was not so small that it could not have been seen by the officer, but was of sufficient size and placement that it gave Officer Oehm reasonable articulable suspicion to believe that the crack substantially obstructed defendant's clear view of the highway. Ac-

cordingly, defendant's challenge to the initial traffic stop lacks merit.

● **Validity of Consent to Search**

■ Defendant next challenges his consent to search the car. Defendant alleges that because he failed to speak and understand English, he did not give consent at all, but that even if he did voice consent, such consent is invalid. Defendant notes that his failure to object to the search was nothing but acquiescence to a claim of lawful authority, which is insufficient to meet the government's burden.

A warrantless search is "per se unreasonable" unless one of specifically established exceptions, like consent, is present. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quotations omitted). Here, both the government and the defendant agree that no probable cause existed to justify the search, and that in the absence of valid consent, the evidence seized from the vehicle should be suppressed.

Valid consent is that which is freely and voluntarily given. United States v. Patten, 183 F.3d 1190, 1194 (10th Cir.1999) (citation omitted). Voluntariness is a question of fact to be determined from the totality of all the circumstances. Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041. A court makes this determination without presuming the consent was voluntary or involuntary. United States v. Hernandez, 93 F.3d 1493, 1500 (10th Cir.1996).

For this exception to apply, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. United States v. Soto, 988 F.2d 1548, 1557 (10th Cir.1993). The government does not discharge its burden "by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The govern-

ment first "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.' " *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995)), *cert. denied*, 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998). The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id.* This determination is made considering the totality of the circumstances. *Schneckloth*, 412 U.S. at 225–27, 93 S.Ct. 2041.

The determination entails weighing several relevant factors. An officer's failure to advise that a person may refuse to consent is relevant, but it is only one factor and is not dispositive. *Pena*, 143 F.3d at 1367; *see Schneckloth*, 412 U.S. at 249, 93 S.Ct. 2041 ("[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."). Other relevant factors include the number of officers present, " 'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and physical and mental condition and capacity of the defendant within the totality of the circumstances.' " *Pena*, 143 F.3d at 1367 (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994) (internal quotation omitted)); *United States v. Cabrera*, 117 F.Supp.2d 1152, 1157 (D.Kan. 2000).

Defendant does not take issue with the number of officers present, or allege physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery. Instead, defendant asserts solely that he does not

understand English sufficiently to have rendered valid consent.

Officer Oehm testified that he believed the defendant understood what the officer asked of him because defendant responded appropriately and did what was asked. Another Officer, Officer Berrios, testified that when he arrived on the scene after the drugs were found, he Mirandized defendant in Spanish, and spoke to him only in Spanish. Officer Berrios served as an interpreter during defendant's subsequent interview at the Junction City Police Department. Officer Berrios testified that he asked defendant if he spoke English, and defendant replied negatively. Officer Berrios testified, however, that he noticed some indication that defendant understood English, and cited an instance when defendant appeared to respond to a statement in English, but did not recall what the response was. (Trans. p. 105–06.)

Defendant's 13 year-old daughter, Karla, took the stand and testified that her father can speak only a few words in English, such as "thank you," and "hi," although he has lived in the United States for 19 or 20 years. She stated that when Officer Oehm stopped their vehicle, she interpreted some words for her father, including the reason why they had been stopped. (Trans. p. 117–18.) She did not recall interpreting anything about the vehicle's insurance, but testified that when the officer reapproached the vehicle, she asked her dad, at the officer's request, to get out of the car because the officer wanted to ask her dad some questions. (*Id.*, p. 118.)

Defendant testified, through the assistance of an interpreter, that he has lived in the United States about twenty years, four of which were illegal. He works in Chandler, Arizona, and previously worked in Illinois, but states that he always uses an interpreter on his jobs in the United States or works exclusively with Latinos or

bilingual individuals. He speaks Spanish in the home and lives in a community that is primarily Spanish speaking, but cannot conduct all business transactions, such as banking, in Spanish. He attended an evening class to learn English for about one month but failed to learn much. He has three children who have been educated in the United States and who speak English well, but prefer to speak Spanish at home.

Defendant testified that when Officer Oehm stopped him, he told Officer Oehm that he didn't speak English and his daughter would interpret. He knew enough to produce his driver's license, but his daughter told him why he had been stopped. When the officer reapproached the vehicle, his daughter told him that the officer wanted to speak with him, so he complied.

Defendant further testified that he understood from his conversation with Officer Oehm at the rear of the vehicle that he was issued a warning, and understood when the officer told him it was "O.K." but he did not understand everything the officer said. He did understand that he was free to go. (Trans. p. 157.) Defendant admitted that he was not upset when the officer began searching his vehicle (Id., p. 160–61), never told the officer that he did not want him to search the vehicle, and never asked why he was searching it, although he denies having given him permission to do so. (Id., p. 161.)

In addition to the testimony at the hearing, the court has reviewed the tapes submitted as evidence. Although the video tape of the car stop does not have any audio of the initial conversation between the officer and the defendant, it does include audio of the relevant portion when the officer requested consent to search. It shows that Officer Oehm returned defendant's driver's license and gave defendant the warning citation, explaining that it was merely a warning. Officer Oehm then stated "You don't have to pay no money," to which defendant replied, "O.K." Officer Oehm then said, "Make sure you get your windshield fixed," and defendant again replied "O.K." The officer then advised defendant, "That's all I have for you, O.K.?" Defendant replied "O.K." a third time and turned as if to leave. Officer Oehm immediately asked, "Could I ask you a couple questions though? You said you were going to Alabama?" The defendant then stated, "Alabama," and Officer Oehm asked, "You're not hauling drugs are you?" The Officer then immediately asked in Spanish: "Drogas?" to which defendant replied "No," and shook his head from side to side. Officer Oehm then asked, "Can I check to make sure?" to which defendant immediately replied "Sure," and gestured with his hands.

The video tape further shows that as Officer Oehm had everyone exit the vehicle, a dog in the vehicle began to bark, at which point defendant spontaneously stated: "Grab the dog," and Officer Oehm then repeated, "Yeah, grab the dog."

The court has also reviewed the translations and transcripts of defendant's interview after his arrest. (Dk. 37 and 43.) Although nearly all of the conversation between defendant and the officers at that time was through an interpreter, defendant did respond to an English statement at least once without the benefit of any interpretation, and did speak in English another time. *See*, Dk. 43, p. 21, and Dk. 37, p. 13 (agent states in English: "Oh, bull shit, that's crazy. I don't believe it," followed by defendant's reply in Spanish "How am I going to be crazy? Why would one want to lose one's children?" (English translation)); Dk. 34, p. 40, and Dk. 37, p. 24 (policeman states "He said I can't even remember where I used to live because as I was telling you this is going to take time

you need to tell me," and defendant then states in English: "Remember that.") Because this interview occurred soon after defendant's conversation with Officer Oehm, it supports the court's finding that at the time defendant was asked for consent to search, he understood and spoke some English.

The evidence fully convinces the court that defendant has a basic ability to understand and communicate in English. Defendant's answers to the officer's questions captured on audio tape, without the aid of any interpreter, were responsive and show that the defendant understood the questions he was asked. The totality of the facts show that defendant understood English well enough to respond to the Officer's request, and to consent to the vehicle search. *See United States v. Corral,* 899 F.2d 991, 994 (10th Cir.1990) (defendant with limited knowledge of English voluntarily consented because he understood the officer's questions, answered questions in English and demonstrated an overall working knowledge of English); *United States v. Sanchez–Valderuten,* 11 F.3d 985, 990–91 (10th Cir.1993) (finding adequate "receptive English language skills" to consent to the search, despite defendant's difficulty in speaking English); *United States v. Marquez,* 2002 WL 1284290, *4 (D.Kan. 2002); *United States v. Valadez-de la Cruz,* 2001 WL 1568356, *3 (D.Kan.2001) (finding consent voluntary where defendant demonstrated a sufficient understanding of the questions that were asked of him). Defendant freely, intelligently, and voluntarily consented to the search of his vehicle, and his consent shall not be found invalid based upon his alleged lack of proficiency in English.

● **Motion to Suppress Statements**

In this motion, defendant seeks to suppress all statements he or his wife made during their interview at the police station, either to officers or between themselves when officers left the room. Defendant admits that he was timely Mirandized and waived his right to remain silent, but contends that all statements were coerced, and that some statements are protected by the marital privilege. Before the court can address the substance of this motion, it must rule upon the parties motions to admit transcripts of the interview in question.

**Motion for admission of transcripts**

After the hearing, both parties separately filed motions for admission of additional exhibits. Each party offers a transcription and translation of an interview with defendant, his wife, and. law enforcement officers following defendant's arrest. Neither party points the court to any relevant language in the transcript, to any instance in which the transcripts differ from one another, or why any such difference is material, choosing instead to leave to the court the arduous task of sifting through over 100 pages of transcript and comparing each line of one transcript to the other.

The government objects to the admission of defendant's exhibit because at the time of the hearing when this issue was discussed, counsel understood that he would be able to review the proposed exhibit for accuracy prior to its submission to this court, and he has had no opportunity to do so. The court understood the same. Showing a proposed exhibit to opposing counsel is not only common courtesy, but is the standard practice required by this court, as both counsel are aware. Further, judicial efficiency is greatly served in the event the parties can agree on one transcription and/or translation, or even on parts thereof. Nonetheless, both parties motions for admission of the transcripts shall be granted.

## Voluntariness of Statements

■ Defendant contends that because of alleged coercion flowing from the agent's statements about defendant's wife and children, his statements were not made voluntarily. The government admits that officers advised defendant that they would make certain concessions for his family if he cooperated, including that they would not arrest his wife if he cooperated. The government contends that the officers' conversation regarding the potential arrest of defendant's wife and custody arrangements for the children merely conveyed true and accurate information which allowed the defendant to make a rational choice.

> In considering whether the confession or statement is one of free will, the courts look to several factors, including: (1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. (Citations omitted). "In no case, however, is any single factor determinative." *[United States v.] Chalan,* 812 F.2d 1302, 1307 [ (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988).]

*United States v. Castorena–Jaime,* 117 F.Supp.2d 1161, 1170 (D.Kan.2000).

The transcript shows that the large majority of the references to defendant's wife and children were made by defendant or his wife, not by law enforcement officers. However, the court finds the following statements by law enforcement officers to be relevant:

> "If there is not agreement you two will get charged and you will be charged with the possession of the drugs with intent to distribute." (Dk.37, p. 2.) "So

you talk as a husband and wife think about your daughters, the 6 sons you have. You have to think about your 6 sons and the 5 daughters." (Id., p. 2.) "So what you have to think ... your daughter, all five of them because they are minors, and do you know what happens, the State itself will take them away ... And you will never see them again....You don't want that, I know your husband doesn't want it either." (Id., p. 3; Dk. 43, p. 5) "So, the two of you are holding back on the truth ... Then both of you will be charged." (Id., p. 13.) "You know we are going to have to hold your wife and daughters till you make the delivery." (Id., p. 32.)

The transcripts contain other statements about potential conversations with the prosecutor which may be construed as conditional promises, but all are vague and non-committal, and are not coercive. *See, United States v. Burgess,* 33 Fed. Appx. 386, 389, 2002 WL 185545, *3 (10th Cir. Feb.6, 2002), *citing United States v. Glover,* 104 F.3d 1570, 1582 (10th Cir.1997) (promise to bring defendant's cooperation to the court's attention not coercive).

The traditional indicia of police coercion are absent in this case. Defendant does not allege that the questioning was unduly long or intimidating, that he was physically punished or threatened, or that he was tricked into making statements. Instead, defendant alleges solely that his statements were the result of coercion on the part of officers who expressly conveyed to him that the extent of his cooperation with the law enforcement officers would determine the fate of his wife and children.

"A defendant's statement that is extracted or induced by threats or promises is involuntary." *United States v. Hernandez,* 93 F.3d 1493, 1503 (10th Cir.1996) (citing *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976)). "Intimi-

dating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment. . . ." *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir.1993) (quoting *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992)). However, the state is not prohibited from inducing a confession with an honest promise of leniency. *United States v. Westbrook*, 125 F.3d 996 (7th Cir.), *cert. denied*, 522 U.S. 1036, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997).

The government asserts, and the record supports, a good faith basis to arrest both the defendant and his wife. *See Westbrook*, 125 F.3d at 1006 (as long as agents had a good-faith basis for pressing charges against the defendant's wife, they impose no undue psychological coercion on a defendant by suggesting that it would be to his or her benefit to cooperate.) Although unfounded "threats to arrest members of a suspect's family may cause a confession to be involuntary," *United States v. Finch*, 998 F.2d 349, 356 (6th Cir.1993) (citing *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)); *see Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir.1981), no such threat is shown here. Informing the defendant that he and his wife could go to jail and that other arrangements would have to be made for the care of their children if the defendant does not cooperate does not render his confession involuntary when these events are merely consequences of defendant's illegal acts. *See United States v. Moore*, 1996 WL 121714, 79 F.3d 1142 (4th Cir.1996) (Table); *United States v. Ponce Munoz*, 150 F.Supp.2d 1125, 1134–36 (D.Kan.2001) (finding an officer's discussion of realistic penalties or results for cooperative and non-cooperative

defendants does not render the defendant's confession or waiver of Miranda rights involuntary or coercive).

The statements made by law enforcement officers, all of which the court has painstakingly reviewed, do no other than reflect the facts, with one notable exception. The court is concerned about the effect of the statement made early in the interview that the state will take the children away and the parents will "never see them again." The court is unaware whether the latter phrase was intended to convey the fact that if both parents were arrested, the state will have to immediately take the children into state's custody, or to convey that if both parents, as non-citizens, are convicted, they may be deported and never have the same relationship again with their children, or to convey something else. This asserted result of defendant's non-cooperation was stated as a fact, was false, was made early in the interview, and made a lasting impression on the defendant, as evidenced by his or his wife's mention of it throughout their discussion of what to do. *See e.g., See*, Dk. 43, p. 21, and Dk. 37, p. 13 (defendant states: "How am I going to be crazy? Why would one want to lose one's children?").

A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). When law enforcement officers deliberately prey upon the [paternal] instinct and inculcate fear in a [father] that [he] will not see [his] child in order to elicit "cooperation," they can exert the improper influence proscribed in *Malloy*. *Tingle*, 658 F.2d at 1336.

The court is well aware that not every false statement by an officer during the course of a defendant's interview will render an otherwise voluntary confession involuntary. *See e.g., Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding interrogator's misrepresentation to suspect that his co-suspect had already confessed did not render suspect's subsequent confession coerced); *Lucero v. Kerby,* 133 F.3d 1299, 1311 (10th Cir.1998)(detective's admission to making false statements about fingerprint evidence, without more, did not render an otherwise voluntary confession. involuntary.) Here, however, the false statement did not merely relate to the defendant's degree of guilt or the strength of the evidence against him, but to a sure and severe familial consequence of not cooperating with the officers. The purpose and objective of that threat was to cause defendant to fear that if he failed to cooperate, he would never see his daughters again.

The court believes that given the totality of the circumstances, the officer exerted improper influence or undue psychological pressure on the defendant by the above threat, sufficient to overbear defendant's will at the time of the confession and to render his confession involuntary. Because the court has so found, it need not address the other issues briefed by the parties, including the federal marital privilege.

IT IS THEREFORE ORDERED that defendant's motion to suppress evidence (Dk.20) is denied, that defendant's motion to suppress statements (Dk.19) is granted, that defendant's motion for admission of additional exhibits (Dk.37) is granted, and that the government's motion for admission of transcript (Dk.43) is granted.

IT IS FURTHER ORDERED that defendant's motion for *Simmons* immunity (Dk.33), which the government does not oppose, is taken under advisement and will be decided at a date closer to trial.