NOT DESIGNATED FOR PUBLICATION

No. 121,493

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE ALEJANDRO QUESADA-LUGONES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed October 8, 2021. Reversed and remanded with directions.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., BUSER, J., and WALKER, S.J.

BUSER, J.:  Jose Alejandro Quesada-Lugones appeals his conviction for possession of cocaine that was found in his pants pocket by a law enforcement officer who stopped him on the street. Quesada-Lugones raises several issues on appeal. First, he contends the district court erred in denying his motion to suppress evidence because his interaction with the officer was not a voluntary encounter. Second, he argues that if the encounter was voluntary, he did not consent to the search of his person. Third, Quesada-Lugones asserts the district court erred in dismissing a prospective juror for cause. Fourth, he claims the district court erred by failing to instruct on jury nullification. Finally, he

1

contends the district court erred by imposing Board of Indigents' Defense Services (BIDS) fees without making a sufficient inquiry into the defendant's financial circumstances.

Upon our review, we hold the district court did not err in finding that Quesada-Lugones and the officer engaged in a voluntary encounter; however, we find reversible error in the officer's search and seizure of the cocaine because there was insufficient evidence that Quesada-Lugones knowingly and voluntarily consented to the search of his person. Accordingly, the district court's denial of Quesada-Lugones' motion to suppress evidence is reversed and remanded. Based on this holding, we decline to address the additional appellate issues pertaining to jury selection and jury nullification. The assessment of BIDS fees is remanded for reconsideration by the district court given our holding.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 13, 2018, Quesada-Lugones and his girlfriend were at a crowded bar in Olathe. According to Quesada-Lugones, three or four men emerged from the restroom in the bar, circled him, shoved him, and pulled at his clothes. Quesada-Lugones told the men he did not want any trouble, whereupon he left the bar alone.

Quesada-Lugones walked home, passing an ongoing traffic stop. Drew Fizpatrick, the Olathe police officer conducting the stop, observed Quesada-Lugones walking down the sidewalk and noticed he appeared lost and cold. The temperature that evening was about 13 degrees with a wind chill of -1 degree. Quesada-Lugones wore a winter jacket, zipped up to his neck, with jeans and shoes but no hat or gloves.

Concerned about the man's welfare, Officer Fitzpatrick completed the traffic stop, drove to where Quesada-Lugones was walking on the sidewalk and pulled up on the

2

opposite side of the street. The officer then crossed the street and approached Quesada-Lugones on foot. As Officer Fitzpatrick approached, Quesada-Lugones removed his Kansas driver's license from his wallet and gave it to the officer. At a later suppression hearing, Officer Fitzpatrick testified that "the majority of [their] conversation" was about whether Quesda-Lugones wanted the officer's help getting home. The officer testified that he believed Quesada-Lugones wanted his help because he was willing to speak with the officer, never attempted or asked to leave, and was cooperative.

Quesada-Lugones also testified through an interpreter at the suppression hearing. According to the defendant, he is from Cuba but has been in the United States for five years. Quesada-Lugones is a native Spanish speaker and testified he had only recently begun taking English classes. He testified that he was afraid during the stop because he does not speak English and he did not know how to communicate with the officer.

Officer Fitzpatrick testified that upon seeing Quesada-Lugones up close, he appeared to be "extremely cold" and smelled of alcohol. The officer was wearing a body camera during his encounter with Quesada-Lugones, and the video footage was shown during the suppression hearing. It shows Officer Fitzpatrick trying to conduct a welfare check with Quesada-Lugones but struggling to communicate with him. The officer asked Quesada-Lugones if he would like a ride home several times, but the defendant did not give clear answers. Given the language difficulties, the encounter is difficult to understand.

Officer Fitzpatrick testified that he believed Quesada-Lugones wanted a ride home and, as a result, walked him across the street to his patrol car. The officer testified that he tried "to communicate with Mr. [Quesada-]Lugones as best as [he] could." When Officer Fitzpatrick asked Quesada-Lugones if he could check his pockets, the officer testified the defendant replied, "[n]o problem" and followed him back to his patrol car. Moreover, Officer Fitzpatrick believed Quesada-Lugones was willing to submit to a pat-down

3

because when the officer asked Quesada-Lugones if he could "check his pockets," the defendant put his hands in the air and appeared to say, "No problem."

Ultimately, Officer Fitzpatrick searched Quesada-Lugones and found cocaine in his front pocket. As a result, the State charged Quesada-Lugones with possession of cocaine in violation of K.S.A. 2017 Supp. 21-5706(a).

Before trial, Quesada-Lugones moved to suppress the cocaine found in his pocket—arguing it was fruit of the poisonous tree because the officer lacked justification for a public safety stop and the defendant had not intelligently and voluntarily consented to the search of his person. At the suppression hearing, the district court ruled that the State did not meet its burden of justifying the public safety stop because Officer's Fitzpatrick's testimony was not "well-articulated or specific enough" to show "the concern of welfare of this pedestrian." The district court denied Quesada-Lugones' motion to suppress, however, concluding that the encounter was voluntary and the "search incident to that encounter was a simple pat-down for legitimate reasons."

In April 2019, a jury found Quesada-Lugones guilty of possession of cocaine. The defendant was sentenced to 10 months' imprisonment but granted a 12 months' probation. The district court advised Quesada-Lugones that he was eligible for early termination of probation after six months if he complied with the terms of his probation. The district court ordered Quesada-Lugones to reimburse $700 in BIDS fees for the representation of his appointed attorney.

Quesada-Lugones appeals.

DENIAL OF MOTION TO SUPPRESS EVIDENCE

Quesada-Lugones contends the district court erred in denying his motion to suppress evidence because the cocaine obtained by Officer Fitzpatrick was the result of an illegal search and seizure. Quesada-Lugones contends the encounter between himself and the officer was not voluntary, as found by the district court, because he did not feel comfortable terminating the encounter and he did not know he had a right to terminate the encounter. Moreover, Quesada-Lugones asserts that regardless of whether the encounter was voluntary, the evidence was illegally obtained because "separate and distinct consent is required for a subsequent search." In response, the State contends the encounter was voluntary and Quesada-Lugones consented to the search.

Quesada-Lugones objected to the introduction of the cocaine at trial, properly preserving this issue for appeal. See *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016).

An appellate court's standard of review in evaluating the district court's ruling on a motion to suppress has two components. First, our court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. Second, the ultimate legal conclusion is reviewed using a de novo standard. When the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review. In reviewing the factual findings, this court does not reweigh the evidence or assess the credibility of witnesses. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The State has the burden to prove that a search and seizure was lawful. *State v. Ton*, 308 Kan. 564, 568, 422 P.3d 678 (2018).

*Voluntary Encounter*

After considering the evidence, the district court ruled the encounter between Quesada-Lugones and Officer Fitzpatrick was voluntary. The district court reasoned that the officer did not intend to seize Quesada-Lugones and that the defendant voluntarily stopped and conversed with the officer. The district judge explained:

> "Officer Fitzpatrick testified he didn't ask for his backing officer to get out with him. He had no intention of needing to draw his weapon, didn't turn on his siren. He had the back-deck flashing lights for his own safety purposes so no one would run into his car. And it does light up that area somewhat, but I don't believe that impinges on the Defendant's conceding or understanding that he is being detained, being seized.
>
> "Officer Fitzpatrick has a very friendly attitude and is only asking for whether or not Mr. Quesada-Lugones is doing all right if he—and if he knows where he's going. That supports—I think, in Officer Fitzpatrick's mind, that he goes into this thinking that this person appears to be lost by looking at his phone, but seems to be meandering along.
>
> "So he then asks. Where do you live? What's your address? And at that point when Mr. Quesada-Lugones is providing his ID—I'm not sure if it's ID or driver's license, but his address, and the officer pursues that, asking is that his address; is that where he wants to go; does he want a ride home.
>
> "Officer has to use sign language, if you will, very rudimentary sign language, to get the point across that he's asking Mr. Quesada[-Lugones] for a ride home. He's shivering when he's contacting him, and he smells alcohol.
>
> "And a legitimate concern that you don't just leave someone out in the extreme cold, trying to find their way home with possible intoxication, that could be a real danger or hazard in trying to get home, not knowing how far away he was at that point. He's looking at the license and offers him a ride home, offers [t]he defendant a ride home.
>
> . . . .
>
> "I think that voluntary encounter is where we are at in this situation."

There are generally four types of encounters between individuals and police:  (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety stops,

and (4) arrests. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). Voluntary encounters are not considered seizures and do not trigger the protections of the Fourth Amendment to the United States Constitution.

In determining whether a law enforcement contact with an individual is a voluntary encounter, Kansas courts determine whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the encounter. 305 Kan. at 606. The court may consider numerous factors in evaluating whether an encounter is voluntary; no single factor is dispositive. *State v. Reiss*, 299 Kan. 291, 298-99, 326 P.3d 367 (2014); *State v. Murphy*, 296 Kan. 490, 492-93, 293 P.3d 703 (2013).

Our Supreme Court has identified "several nonexclusive factors that tend to establish a voluntary encounter." *State v. Andrade-Reyes*, 309 Kan. 1048, 1054, 442 P.3d 111 (2019). These factors include: "'knowledge of the right to refuse, a clear communication that the driver [or individual] is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning." 309 Kan. at 1054 (quoting *State v. Thompson*, 284 Kan. 763, 811, 166 P.3d 1015 [2007]). An officer's subjective intent in stopping a person is relevant only if the person is made aware of that intent. *State v. McGinnis*, 290 Kan. 547, 555, 233 P.3d 246 (2010).

On the other hand, our Supreme Court has also set out factors tending to establish that an individual has been seized by a law enforcement officer:

> "'[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, a request to accompany the officer somewhere, interaction in a nonpublic place, absence of other members of the

7

public, or the display of emergency lights. [Citations omitted.]'" *Andrade-Reyes*, 309 Kan. at 1054 (quoting *Thompson*, 284 Kan. at 811).

Quesada-Lugones contends there are four reasons why Officer Fitzpatrick's encounter with him was not voluntary but, in fact, an illegal seizure. First, he argues "nothing in the record indicates that Officer Fitzpatrick communicated to [him] that he a had a right to refuse to answer questions, or that he was free to terminate the encounter." While Quesada-Lugones concedes that the officer was not obligated to inform him of these rights, he contends "the failure to inform [him] is one factor this [c]ourt considers in determining whether a stop is voluntary under the totality of the circumstances." We agree with Quesada-Lugones that although such an admonition is not mandated, it is a relevant factor for courts to consider when evaluating the voluntariness of the encounter. See *Thompson*, 284 Kan. at 811. This factor weighs in favor of an involuntary encounter.

Second, in relation to his first argument, Quesada-Lugones claims that he did not know he had a right to terminate the encounter or refuse to answer questions. In support, Quesada-Lugones testified that he was not born in the United States—he is from Cuba— and he moved to the United States five years ago. Quesada-Lugones is not a native English speaker and testified he had no prior police encounters. As more fully discussed later in this opinion, Quesada-Lugones' primary language is Spanish, and his Cuban background tends to support an involuntary encounter.

Third, Quesada-Lugones asserts that while he voluntarily gave Officer Fitzpatrick his identification upon the officer's approach, the officer did not return it. According to Quesada-Lugones, his limited knowledge and understanding of police encounters motivated his behavior during the encounter. For example, he testified that he gave Officer Fitzpatrick his identification immediately upon being approached by the officer because "it is obligatory [in Cuba] to do that."

8

As Quesada-Lugones concedes, however, Officer Fitzpatrick did not ask for his identification nor used it to conduct a warrant check, although he kept it during the brief conversation. In *State v. Pollman*, 286 Kan. 881, 888-89, 190 P.3d 234 (2008), our Supreme Court held that

"an officer's mere request for identification or information about one's identity does not, by itself, constitute a seizure . . . .

"Nevertheless, if a law enforcement officer retains a driver's license, this can be a factor considered in the totality of the circumstances and may, absent offsetting circumstances, mean a reasonable person would not feel free to leave without his or her license. [Citations omitted.]"

Given the fact that Officer Fitzpatrick did not request identification, but Quesada-Lugones voluntarily provided it to him, and the officer used the document to determine the location of Quesada-Lugones' home, not to check for outstanding warrants, we assess these facts as favoring a voluntary encounter.

Finally, Quesada-Lugones also complains that Officer Fitzpatrick was in uniform, his patrol car displayed flashing lights, and he directed Quesada-Lugones' movements towards the patrol car.

There were also numerous factors in support of the district court's legal conclusion that the encounter was voluntary. On appeal, Quesada-Lugones candidly concedes that, as found by the district court, "some factors weigh in favor of finding the stop voluntary: "namely, Fitzpatrick did not use violence, a commanding tone of voice, activate his sirens, or display his weapon." Moreover, as recorded on Officer Fitzpatrick's body camera, the officer's language and tone conveyed, in the words of the district court, "a very friendly attitude." Officer Fitzpatrick parked on the opposite side of the street and approached Quesada-Lugones alone. The encounter was in a residential area with

streetlights. Although the patrol car's rear deck lights were illuminated, Officer Fitzpatrick testified this was a common safety practice when parked on a road at night.

The district court's factual findings were supported by substantial competent evidence. On balance, the factors tending to establish a voluntary encounter outweigh the factors tending to show that during the brief conversation Officer Fitzpatrick seized Quesada-Lugones. Given the totality of circumstances, we are persuaded that the district court correctly concluded as a matter of law that the interaction between Officer Fitzpatrick and Quesada-Lugones was a voluntary encounter.

*Consent to Search*

Apart from the issue of whether the interaction with Officer Fitzpatrick was a voluntary encounter, Quesada-Lugones contends that the seizure of the cocaine from his pants pocket violated his Fourth Amendment rights because he did not knowingly and voluntarily consent to the search. In response, the State argues the district court correctly ruled that Quesada-Lugones knowingly and voluntarily consented to the pat-down and search.

In addressing this aspect of the search and seizure issue, the district judge reasoned:

> "I agree that Mr. Quesada[-Lugones], in his own testimony, that he's saying he's afraid because of what he's seen on TV. And having lived in the United States—I think his testimony was for five years, here in Kansas the last four years.
> "Even though this was his first contact with the police, I'd say that it does make it different than someone who's just been here five days or five weeks or five months. Because that communication, very broken English and Spanish, going back and forth and certainly broken Spanish that Officer Fitzpatrick tries to use being conveyed to Mr.

10

Quesada-Lugones is that, [c]ome over to my car, and asks if he can search the Defendant's pockets. That was not a direct answer, but then the 'no problem.'

"And as pointed out, lots of interpretations to 'no problem.' As Mr. Quesada[-Lugones] testified, I was saying, [n]o problem; I didn't want to cause any problems, either for myself or for the officer. Didn't want anybody—didn't want to disrespect anybody.

"The fact that Mr. Quesada-Lugones states in his own testimony he did not understand he would be searched does not overcome what happened there that night, that morning.

"Reasonable for Officer Fitzpatrick to take the statement of 'no problem' and go ahead—for all the right reasons, legitimate standard practice for the officer, before allowing anyone into his patrol car, for his own safety and for the integrity of maintaining the integrity of his vehicle, would pat down anyone before they got into the car. And that's when the drugs were found.

"I think that voluntary encounter is where we are at in this situation. The search incident to that encounter was a simple pat-down for legitimate reasons. And for that reason, the Defendant's motion to suppress the evidence found on Mr. Quesada[-Lugones] by Officer Fitzpatrick during that pat-down, the motion to suppress will be denied on those grounds."

Quesada-Lugones understands the district court's ruling as justifying the pat down and search as an incident to the voluntary encounter and as a legitimate police practice for an officer to employ prior to allowing an individual inside the police vehicle. Alternatively, Quesada-Lugones argues the district court erred in finding that he knowingly and voluntarily consented to the search.

Our reading of the district court's ruling suggests the court did consider Officer Fitzpatrick's pat-down and search of Quesada-Lugones as a permissible police practice designed to ensure the safety of the officer while the defendant was transported in the police car. While this practice may constitute an ordinary safety procedure from a law enforcement perspective, it is not a permissible practice under the Fourth Amendment unless the individual knowingly and voluntarily consents. See *Andrade-Reyes*, 309 Kan.at 1064.

11

"Generally, consenting to an encounter does not grant officers permission to frisk or search. Another consent, this one agreeing to a search, is usually necessary." *Andrade-Reyes*, 309 Kan. at 1061. The *Andrade-Reyes* court supported this rule with the explanation from Justice Harlan in his concurring opinion in *Terry v. Ohio*, 392 U.S. 1, 32, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (Harlan, J., concurring), when he said regarding voluntary encounters: "'[O]rdinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.'" *Andrade-Ryes*, 309 Kan. at 1061 (quoting *Terry*, 392 U.S. at 32).

Our Supreme Court in *Andrade-Reyes* also relied on a leading treatise on the Fourth Amendment that explained these principles mean an officer cannot initiate a search simply because he or she believes an individual is armed:

> "'[I]n the absence of some legitimate basis for the officer being in immediate proximity to the person, a degree of suspicion that the person is armed which would suffice to justify a frisk if there were that basis will not alone justify such a search. For example, if a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop. *Likewise, if an officer, lacking the quantum of suspicion required by* Terry *to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed; in such a case the officer may protect himself by not engaging in the confrontation.*' 4 LaFave: A Treatise on the Fourth Amendment, Search & Seizure § 9.6(a) (5th ed. 2018)." (Emphasis added.) Andrade-Reyes, 309 Kan. at 1061-62.

Some exceptions to this rule exist, however, such as when a person's conduct during a voluntary encounter gives rise to reasonable suspicion that the officer's safety is in danger. 309 Kan. at 1064. But the State did not argue an exception applied, and there was no evidence presented that Quesada-Lugones posed any threat or danger to the

12

officer. Because the State does not contend that an exception applies, the general rule that an individual engaged in a voluntary encounter with a law enforcement officer must knowingly and voluntarily consent to a pat-down or search of their person controls the search and seizure analysis.

Moreover, although the district court did not specifically rule that Quesada-Lugones consented to the pat-down and search of his pants pocket, the court's comments may be understood as making a legal conclusion that Quesada-Lugones, in fact, consented to the pat-down and search. In his motion to suppress, Quesada-Lugones challenged the admissibility of the evidence by asserting that he did not consent to the search. In the State's response, it addressed the voluntary consent to search issue. And at the suppression hearing, the State presented evidence on the consent issue and argued the consent exception to the court. As a result, we conclude the district court was fully informed of the consent issue and by its ruling it intended to find that Quesada-Lugones consented to the search when the court stated it was "[r]easonable for Officer Fitzpatrick to take the statement of 'no problem' and go ahead."

The State has the burden of establishing the scope and voluntariness of the consent to search. Whether a consent is voluntary is an issue of fact which appellate courts review to determine whether substantial competent evidence supports the trial court's findings. *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015). If the parties do not dispute the material facts, the suppression issue is solely a question of law. *State v. Spagnola*, 295 Kan. 1098, 1104, 289 P.3d 68 (2012). Here, there is considerable dispute about what Quesada-Lugones said and what he meant when he responded to Officer Fitzpatrick's request to search his pockets.

Quesada-Lugones argues that he did not verbally consent to the search, contending that when Officer Fitzpatrick asked if he could search his pockets, he responded, "No. I don't know." On appeal, the State argues it "believes that Defendant said, "'[N]o, no, no,

13

no, no problem'" in response to Officer Fitzpatrick's request to search. Unfortunately, the video's audio is muffled by wind and background noises, so the exact response by Quesada-Lugones is unclear. However, the district court made a factual finding that when Officer Fitzpatrick asked to search Quesada-Lugones' pockets, "There was not a direct answer, but then the 'no problem.'" This finding is consistent with Officer Fitzpatrick's testimony that when he asked if he could check Quesada-Lugones' pocket, "it appeared to [him]" that Quesada-Lugones said, "No problem."

At the suppression hearing, on cross-examination, Quesada-Lugones' seemingly conceded to saying "[n]o problem," but in his retelling, the meaning of his response was not that he consented to a search:

> "[THE STATE]: So when you said, [n]o problem, for the search, you recognized [Officer Fitzpatrick] was asking you for a search, and you were just trying to cooperate?
> "[QUESADA-LUGONES]: I didn't understand that he was going to search me.
> "[THE STATE]: What did you think was happening?
> "[QUESADA-LUGONES]: I had no idea about what was happening. Honestly, I just wanted to cooperate as much as I could."

Although Quesada-Lugones never explicitly admitted using the phrase "[n]o problem" when the officer asked to search his pockets, we conclude the district court's factual finding that he spoke those words is supported by substantial competent evidence. The meaning of that response, however, is less certain.

"A warrantless search is always unreasonable unless an exception to the warrant requirement applies." *State v. Daino*, 312 Kan. 390, 396, 475 P.3d 354 (2020). The State bears the burden of establishing the defendant's consent was valid by a preponderance of the evidence. 312 Kan. at 405; *State v. Boggess*, 308 Kan. 821, 827, 425 P.3d 324 (2018).

14

To prove consent, the State must "(1) provide clear and positive testimony that consent was unequivocal, specific, and freely and intelligently given; and (2) demonstrate the absence of duress or coercion, express of implied." *Daino*, 312 Kan. at 397; *Cleverly*, 305 Kan. at 613. In the case on appeal, there is no evidence of duress or coercion. Officer Fitzpatrick's body camera memorialized a friendly exchange. The only question is whether there was clear and positive testimony that Quesada-Lugones' consent to search his person was knowingly and voluntarily given to Officer Fitzpatrick.

We are persuaded that the district court made an error of law in concluding that Quesada-Lugones knowingly and voluntarily consented to the pat-down and search. First—and foremost—are the obvious difficulties that Officer Fitzpatrick and Quesada-Lugones had in understanding each other. As acknowledged by the district court, the communication was "very broken English and Spanish, going back and forth and certainly broken Spanish that Officer Fitzpatrick tries to use being conveyed to Mr. Quesada-Lugones."

Federal courts have found language barriers relevant when determining whether consent was freely given. See *United States v. Cruz-Zamora*, 318 F. Supp. 3d 1264, 1268 (D. Kan. 2018) ("In a situation where a defendant is not fluent in the same language as the officer, the court can infer from the circumstances whether the defendant understood the officer's questions."). See also *United States v. Alcarez-Mora*, 246 F. Supp. 2d 1146, 1152 (D. Kan. 2003) ("The totality of the facts show that defendant understood English well enough to respond to the Officer's request, and to consent to the vehicle search.").

In *United States v. Benitez-Arreguin*, 973 F.2d 823 (10th Cir. 1992), the Tenth Circuit Court of Appeals affirmed the district court's finding that a search of the defendant's bag at a train station was not consensual. 973 F.2d at 829. Of relevance to the case on appeal, the defendant testified he did not speak English, and the officers used signs to convey that they wanted to search the defendant's suitcases. The defendant

15

testified that he did not understand he had the right to deny the officers permission to look in the bag. After the officers indicated they were looking for illegal drugs, "the defendant's response to the officer's statements was only to shrug his shoulders and hold his hands up as if to signify he did not know anything." 973 F.2d at 825.

Based on this encounter, the Tenth Circuit affirmed the district court's finding that the encounter was not consensual because "[t]here was no clear and unequivocal or specific permission given." 973 F.2d at 826. Of relevance here, the court added:  "Also, there was an obvious language barrier and it was obvious to the officer that the defendant did not speak English. The pantomime gestures were not sufficient to produce a consent to search." 973 F.2d at 826.

Returning to the case on appeal, as found by the district court, the conversation between Officer Fitzpatrick and Quesada-Lugones was marked by obvious difficulties in language. The officer candidly testified that he tried "to communicate with Mr. [Quesada-]Lugones as best as [he] could." Upon our review of the body camera footage, we note numerous occasions where the officer's questions were answered by Quesada-Lugones with responses that conveyed a lack of understanding the questions. This is not surprising given that the defendant's primary language is Spanish. And like the officer in *Benetiz-Arreguin*, Officer Fitzpatrick used what the district court described as "very rudimentary sign language."

Additionally, assuming that Quesada-Lugones understood that Officer Fitzpatrick was asking him for consent to pat down and search his person, the defendant's "[n]o problem" response, as pointed out by the district court, is subject to "lots of interpretations." Our difficulty with the district court's legal conclusion that Quesada-Lugones consented to the search is that it was the State's burden to provide clear and positive testimony that consent was "unequivocal, specific, and freely and intelligently given." *Daino*, 312 Kan. at 405; *Cleverly*, 305 Kan. at 613. This is a high bar of proof

16

that precludes uninformed, vague, and ambiguous responses susceptible to different meanings.

Moreover, the bodycam footage corroborates Quesada-Lugones' testimony that he was endeavoring to fully cooperate with Officer Fitzpatrick without any knowledge or consideration of whether it was constitutionally permissible for him to decline the officer's request. The officer acknowledged that he did not inform Quesada-Lugones of his constitutional right to decline the request. All things considered, Quesada-Lugones' verbal and nonverbal responses to Officer Fitzpatrick's question seeking consent persuade us that the defendant was merely acquiescing to a claim of lawful authority, rather than knowingly and voluntarily consenting to the search." See *Daino*, 312 Kan. at 397 ("A showing of mere acquiescence to a claim of lawful authority will not satisfy this burden.").

Under the totality of the circumstances, we hold the district court erred in its legal conclusion that Quesda-Lugones consented to the search of his person which resulted in the discovery of the cocaine. Accordingly, the district court's denial of Quesada-Lugones' motion to suppress evidence is reversed and remanded. The issue of BIDS fees is also remanded for reconsideration by the district court given our holding.

Reversed and remanded with directions.